PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-2120

PERDUE FOODS LLC,

Plaintiff - Appellant,

v.

BRF S.A.,

Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore. James K. Bredar, District Judge. (1:14-cv-01007-JKB)

Argued: December 9, 2015         Decided: February 19, 2016

Before MOTZ and FLOYD, Circuit Judges, and John A. GIBNEY, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Floyd and Judge Gibney joined.

**ARGUED:** Damon W.D. Wright, VENABLE LLP, Washington, D.C., for Appellant. Jeffrey Eric Ostrow, SIMPSON THACHER & BARTLETT LLP, Palo Alto, California, for Appellee. **ON BRIEF:** Brandon C. Martin, Palo Alto, California, Lori E. Lesser, SIMPSON THACHER & BARTLETT LLP, New York, New York; Geoffrey H. Genth, KRAMON & GRAHAM, P.A., Baltimore, Maryland, for Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

Perdue Holdings, Inc. appeals the district court's dismissal of its breach of contract action against BRF S.A. for lack of personal jurisdiction. Perdue contends that BRF purposefully availed itself of the privilege of doing business in Maryland, and thus that personal jurisdiction over BRF properly lies in the United States District Court for the District of Maryland. For the reasons that follow, we affirm.

I.

Perdue, a wholly owned subsidiary of a family-owned international food producer headquartered in Maryland, sells poultry using the mark "PERDUE." BRF, an international food company and exporter of poultry meats headquartered in Brazil, sells poultry using the mark "PERDIX." BRF's sole connection to Maryland is its relationship with Perdue.

In 2002, Perdue became concerned about potential consumer confusion between the similar PERDUE and PERDIX trademarks. Perdue contacted BRF's predecessor, Perdigão Agroindustrial S.A., and the parties negotiated -- remotely -- a 2003 "Worldwide Coexistence Agreement" and a later 2005 addendum (hereafter collectively "the Agreement"). BRF executed the Agreement in Brazil and Perdue executed it in Maryland.

2

In the Agreement, the parties stated that they sought "to avoid any and all confusion between" their respective marks and "to resolve all pending and future possible controversies regarding" the marks. To that end, Perdue agreed to refrain from registering its PERDUE mark in Brazil, and BRF agreed to abandon a version of its PERDIX mark worldwide. The parties also agreed to withdraw opposition worldwide to each other's marks that complied with the Agreement. The Agreement states that it will remain in force for the life of the respective trademarks. It contains a Maryland choice-of-law clause.

From 2012 to 2014, Perdue bought an aggregate 715,000 pounds of chicken (valued at approximately $606,903.80) from BRF. Perdue sent purchase orders from Maryland and BRF sent invoices to Maryland for the orders, but at Perdue's direction BRF shipped the chicken from Brazil to Tanzania.

Later in 2014, Perdue brought this action against BRF in federal court in the District of Maryland. Perdue alleged that BRF breached the Agreement by pursuing new applications for trademark registrations in Argentina, Morocco, São Tomé & Príncipe, and Uruguay and by refusing to abandon existing trademark registrations in Canada, China, Hong Kong, Kuwait, Lebanon, Argentina, Bolivia, Paraguay, and Uruguay (hereafter, "Foreign Countries" refers to these two groups of countries collectively).

3

Pursuant to Fed. R. Civ. P. 12(b)(2), BRF moved to dismiss Perdue's suit for lack of personal jurisdiction.  The district court held that Perdue had failed to allege facts sufficient to establish that BRF had the requisite minimum contacts with Maryland.  Accordingly, the court held that it lacked personal jurisdiction over BRF and granted BRF's motion to dismiss.  Perdue filed this timely appeal.

## II.

The sole issue on appeal is whether the district court had personal jurisdiction over BRF.  We review a judgment dismissing for lack of personal jurisdiction de novo.  Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 276 (4th Cir. 2009). Where, as here, the district court decides jurisdiction on the motion papers alone, the plaintiff need only make a "prima facie showing of a sufficient jurisdictional basis" to prevail.  Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989).

When a federal court sits in diversity, it "has personal jurisdiction over a non-resident defendant if (1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process."  Nichols v. G.D. Searle & Co., 991 F.2d 1195, 1199 (4th Cir. 1993).  The reach of Maryland's long-arm statute is coextensive with the reach of the Due Process Clause of the

4

United States Constitution, so the "statutory inquiry merges with [the] constitutional examination." Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC, 878 A.2d 567, 580 (Md. 2005).

A court may exercise general or specific personal jurisdiction. General personal jurisdiction requires "continuous and systemic" contacts with the forum state. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16 (1984). Perdue does not claim that BRF has such contacts with Maryland and does not assert that the district court had general personal jurisdiction over BRF. What Perdue does claim is that the district court had specific personal jurisdiction over BRF arising from BRF's contacts with Perdue.

For a court to have specific personal jurisdiction over a defendant, the defendant must have "purposefully established minimum contacts in the forum State" such "that [it] should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (internal quotation marks and citations omitted). This analysis is not "mechanical," id. at 478; a court must weigh "the totality of the facts before" it, Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 561 (4th Cir. 2014). To determine whether specific jurisdiction lies in the forum state, "we consider (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether

5

the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (internal quotation marks omitted). The plaintiff must prevail on each prong. Consulting Eng'rs, 561 F.3d at 278.

## III.

Perdue's contention that a federal court in Maryland has personal jurisdiction over BRF falters on the first prong. Under that prong, we consider numerous nonexclusive factors to assess a party's purposeful availment. Consulting Eng'rs, 561 F.3d at 278. In the business context, these factors include whether the defendant "maintains offices or agents in the forum state;" "owns property in the forum state;" "reached into the forum state to solicit or initiate business;" "deliberately engaged in significant or long-term business activities in the forum state;" or "made in-person contact with the resident of the forum in the forum state regarding the business relationship." Id. We also consider "whether the parties contractually agreed that the law of the forum state would govern disputes;" "whether the performance of contractual duties was to occur within the forum;" and "the nature, quality and

6

extent of the parties' communications about the business being transacted." Id.

Perdue has alleged few facts to satisfy its prima facie burden in support of personal jurisdiction. Indeed, the only fact that it alleges that indisputably weighs in favor of jurisdiction is that the Agreement includes a Maryland choice-of-law clause.

Many undisputed facts indicate that a Maryland court does not have personal jurisdiction over BRF. The company employs no Maryland officers or agents and owns no property in the state. BRF did not initiate the negotiations that led to the Agreement, and no BRF employee traveled to Maryland in connection with the Agreement. BRF conducts no business in Maryland: it does not import any products into or sell or ship products to any clients in Maryland, and it has no contract with any entity in Maryland other than Perdue. BRF's alleged breach of the Agreement occurred not in Maryland, but in the Foreign Countries.[1]

Further, the Agreement does not even require Perdue to perform any contractual duties in Maryland. If BRF had entered

---

[1] Perdue also alleged that BRF had filed, but had later withdrawn, intent-to-use trademark applications for the PERDIX mark with the United States Patent and Trademark Office. Assuming that this constituted breach of the Agreement, the breach did not occur in Maryland -- the United States Patent and Trademark Office is headquartered in Virginia. See About Us, United States Patent and Trademark Office, http://www.uspto.gov/about-us (last modified Feb. 12, 2015).

7

a contract that required Perdue to perform significant contractual duties in Maryland, personal jurisdiction over BRF might lie in Maryland. See Peanut Corp. of Am. v. Hollywood Brands, Inc., 696 F.2d 311, 314 (4th Cir. 1982). But although Perdue executives may decide global trademark strategy in Maryland, the Agreement does not require those decisions to take place in Maryland.

Nor can Perdue establish that BRF "deliberately engaged in significant or long-term business activities in the forum state." Consulting Eng'rs, 561 F.3d at 278. Of course, such a showing could provide a basis for personal jurisdiction over a defendant, as it did in Burger King. Moreover, a plaintiff may be able to make such a showing through a single contract because often a contract is "but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Burger King, 471 U.S. at 479 (internal quotation marks omitted). Thus, specific personal jurisdiction can arise from one contract "where the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between [it]self and residents of the forum." Id. at 475-76 (internal quotation marks and citations omitted).

In Burger King, the Court held that, although the defendant lacked other contacts with the forum state, a single contract provided a sufficient basis for personal jurisdiction. Id. at 478-80. That contract was a franchise agreement between the Burger King Corporation, headquartered in Florida, and a franchisee citizen of Michigan. Id. at 464-66. The franchisee initiated negotiations with Burger King for a franchise agreement, but never traveled to Florida. Id. at 479-80. The franchise agreement contained not just a Florida choice-of-law provision, like the Agreement here, but also other significant provisions not present here. Id. at 465-66. The franchise agreement established "a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida." Id. at 480. The franchisee promised to pay a franchise fee, monthly royalties, advertising and sales promotion fees, and rent to Burger King in Florida, and to submit to regulation from Burger King in Florida. Id. at 465-66. Weighing all of these factors, the Supreme Court held that the federal district court in Florida had personal jurisdiction over the Michigan franchisee.

Here, by contrast, the Agreement does not establish a series of continuing contacts between BRF and Perdue in

9

Maryland.[2]  The Agreement does not launch any ongoing collaboration or promise frequent interactions between these two companies.  Rather, it expressly prevents BRF from doing business in Maryland with a version of its trademark.  Of course, this constitutes a contractual duty.  And the Agreement was certainly significant, given its global nature and branding implications.  But these ongoing duties <u>not to do business</u> in Maryland do not demonstrate that BRF purposefully availed itself of the privilege of <u>doing business</u> in Maryland.

Perdue contends that, in <u>Burger King</u>, the Supreme Court held that all contracts creating continuing obligations with a party in the forum state require a finding of purposeful availment.  We do not read <u>Burger King</u> as creating such a bright-line rule.  First, as discussed above, <u>Burger King</u> itself admonished that personal jurisdiction cannot "turn on mechanical

---

[2] Perdue contends that we should consider facts that speak to whether BRF deliberately engaged in significant activities in Maryland separately from those that speak to whether it created continuing obligations with Maryland residents.  However, the "constitutional touchstone" of the analysis articulated in <u>Burger King</u> is "whether the defendant purposefully established 'minimum contacts' in the forum State."  471 U.S. at 474 (internal citations omitted).  "Continuing obligations" alone can potentially suffice, but courts need not consider any facts or factors in isolation when analyzing the defendant's contacts with the forum state.  The <u>Burger King</u> Court itself considered that the defendant "did not maintain offices in" the forum state and "ha[d] never even visited there" in addition to considering the continuing obligations created between the defendant and the forum state by virtue of the franchise agreement.  <u>Id.</u> at 479.

10

tests." 471 U.S. at 478 (internal quotation marks omitted). Second, implicit in the Supreme Court's distinction between a contract -- which cannot, by itself, establish purposeful availment, id. at 478 -- and a contract with continuing obligations -- which "manifestly" constitutes purposeful availment, id. at 475-76 -- is the assumption that the continuing obligations strengthen a defendant's contacts with the plaintiff's forum. Cf. id. at 479 (noting that future consequences are ordinarily "the real object of [a] business transaction" (citation and internal quotation marks omitted)). The "continuing obligations" set forth in the Agreement in this case did no such thing. They had no effect on the "extent, nature, and quality" of BRF's contacts with Maryland. See Consulting Eng'rs, 561 F.3d at 281.

In an attempt to equate its case to Burger King, Perdue points to a handful of intermittent chicken orders as evidence of a collaborative, long-term relationship that it maintains would not have existed absent the Agreement. Perdue argues that without the Agreement the companies would have been litigating over trademarks instead of doing business together. But even if the Agreement made these chicken orders possible, these contacts -- receiving purchase orders from and sending invoices to Maryland for chicken shipments to Tanzania -- are far more

11

attenuated than the frequent and important contacts that the Burger King franchise agreement contemplated.

We recognize that physical presence in the forum state is not essential. Rather, "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." Burger King, 471 U.S. at 476. We emphasize that if the parties had entered a contract that created a meaningful relationship with frequent communication, even if no BRF employee entered Maryland, personal jurisdiction might well lie in the federal district court in Maryland. However, BRF neither purposefully directed activities toward Maryland nor established regularly recurring and ongoing interactions with Perdue in Maryland. "Because a sovereign's jurisdiction remains territorial, to justify the exercise of personal jurisdiction over a non-resident defendant, the defendant's contacts with the forum state must have been so substantial that they amount to a surrogate for presence and thus render the exercise of sovereignty just." Consulting Eng'rs, 561 F.3d at 277-78 (internal quotation marks omitted). Such substantial contacts are absent here.

Given the undisputed facts in this case, we can only conclude that BRF did not purposefully avail itself of the

privilege of doing business in Maryland.  Thus, the district court correctly held that it lacked personal jurisdiction over BRF.

## IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.