**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2030**

ANTHONY M. FIDRYCH; PATRICIA ANNE FIDRYCH,

Plaintiffs - Appellants,

v.

MARRIOTT INTERNATIONAL, INC.,

Defendant - Appellee.

Appeal from the United States District Court for the District of South Carolina, at Charleston.  Bruce H. Hendricks, District Judge.  (2:17-cv-02195-BHH)

Argued:  December 11, 2019                    Decided:  March 2, 2020

Before AGEE and QUATTLEBAUM, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Affirmed in part, vacated in part, and remanded by published opinion.  Senior Judge Traxler wrote the opinion, in which Judge Agee and Judge Quattlebaum joined.

**ARGUED:**  Nathan Maxwell Crystal, CRYSTAL & GIANNONI-CRYSTAL, LLC, Charleston, South Carolina, for Appellants.  Paul K. Leary, Jr., COZEN O'CONNOR, Philadelphia, Pennsylvania, for Appellee.  **ON BRIEF:**  Mark C. Tanenbaum, MARK C. TANENBAUM, PA, Mount Pleasant, South Carolina, for Appellants.  Matthew Bleich, COZEN O'CONNOR, Philadelphia, Pennsylvania, for Appellee.

TRAXLER, Senior Circuit Judge:

Bud Fidrych and his wife, both South Carolina residents, sued Marriott International in South Carolina district court after Fidrych was injured at the Boscolo Milano, a Marriott-affiliated hotel in Milan, Italy. After Marriott failed to file a timely answer to the complaint, the district court clerk, at the Plaintiffs' request, made an entry of default. The district court subsequently entered what it described as a default judgment and set a date for the damages hearing. That same day, the district court sent Marriott notice of the default and of the damages hearing date. Five days after receiving notice, Marriott filed a motion to set aside the default, in which it argued that the court lacked personal jurisdiction over Marriott. The district court set aside the default and subsequently granted Marriott's motion to dismiss for lack of personal jurisdiction. The Fidryches appeal, challenging the court's decisions to set aside the default and to dismiss for lack of jurisdiction. They also contend that the district court erred by refusing to award them attorney's fees as a sanction for Marriott's failure to timely answer the complaint. As we will explain, we affirm the district court's dismissal for lack of personal jurisdiction, but we vacate the district court's denial of sanctions and remand that issue for reconsideration.

I.

Marriott is incorporated in Delaware, with its principal place of business in Maryland. Of the 6,200 hotels in the Marriott system, ninety (1.45%) are in South Carolina. Marriott does not own any of those ninety hotels – sixty-three are franchisees, and the remaining twenty-seven are licensed or managed by Marriott. Marriott has a Certificate of

2

Authority issued by the South Carolina Secretary of State, as is required of all foreign corporations transacting business in the state. *See* S.C. Code § 33-15-101(a).

Marriott's website permits online booking and is accessible in South Carolina. When reserving a room online, the website requires the guests to provide their address and other personal information, and it allows guests to use a drop-down menu to select the place of their residence. The drop-down menu lists South Carolina, along with every other state in the country and every other country in the world.

The Fidryches are South Carolina residents. They are members of Marriott's rewards program and have frequently stayed in Marriott and Marriott-affiliated hotels around the world. Bud Fidrych was traveling to Milan as part of his job as a demonstration pilot for Gulfstream Aerospace Corporation. According to the complaint, the Gulfstream team of which Fidrych was a member typically stayed at Marriott hotels when travelling for work, in part because the employees were members of Marriott's rewards program and because they received a discount by virtue of a relationship between Marriott and General Dynamics, Gulfstream's parent company.

Fidrych alleges that he specifically requested a Marriott hotel in Milan because he always felt safe and comfortable at Marriott hotels, but he was not otherwise involved in booking. Instead, the complaint alleges that in accordance with the usual Gulfstream procedures, the reservations for the trip were handled by a member of Fidrych's work team, who used a travel agency to book the rooms at the Boscolo. The Boscolo is not owned or managed by Marriott, but it is part of Marriott's "Autograph Collection" of hotels. The

3

operation of the Boscolo is governed by a franchise agreement to which Marriott is not a party.

Fidrych's affidavit alleges that at some point before the trip, he reviewed the Boscolo on Marriott's website. The Marriott logo "was prominently displayed on the website," which gave him confidence in the Boscolo, particularly since there were no disclaimers stating that Marriott would not be responsible for the Boscolo's conditions or services. J.A. 231. Fidrych does not allege that he was in South Carolina when he looked up the Boscolo, nor does he specify whether he researched the hotel before or after the reservations were made.

During his stay at the Boscolo, Fidrych was injured when the glass shower door shattered in his hand, severing a tendon in his thumb. Fidrych underwent two surgeries to repair the damage to his hand. The Fidryches subsequently filed suit against Marriott in federal district court in South Carolina.

After Marriott was served, it tendered defense of the action to the management of the Boscolo, in light of the Boscolo's contractual indemnification obligations. Boscolo management failed to take appropriate action, and no answer was filed. At the Plaintiffs' request, the district court clerk made an entry of default. The district court subsequently granted Fidrych's motion for default judgment and set a date for a damages hearing. Although notice to Marriott was not required, the district court sent Marriott notice of the default and the hearing. Within a few days, Marriott filed a motion to set aside the default in which it asserted good cause to be relieved of the default and argued that the district court lacked personal jurisdiction over it.

4

The district court granted the motion to set aside the default under the standards set out in Rule 55 of the Federal Rules of Civil Procedure. In that order, the court invited the Plaintiffs to file a motion for sanctions against Marriott, noting that attorneys fees could be an appropriate sanction. After the default was set aside, Marriott filed a motion to dismiss for lack of personal jurisdiction and the Plaintiffs filed a motion seeking sanctions of more than $86,000 in attorneys' fees and expenses. The case was subsequently transferred to a different district judge, who granted Marriott's motion to dismiss for lack of personal jurisdiction. As to the Plaintiffs' motion for sanctions, the judge denied it, explaining that the requested amount was "excessive, and that Plaintiffs have not shown an adequate causal link between the default judgment and the total requested fees." J.A. 252. This appeal followed.

II.

The Plaintiffs first challenge the standard applied by the district court when considering Marriott's motion to set aside the default. Rule 55 provides that the district court "may set aside an entry of default for good cause, and it may set aside a final default judgment under Rule 60(b)." Fed. R. Civ. P. 55(c). Rule 60(b) provides that a "final judgment" may be set aside, *inter alia*, if the judgment is the product of "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). When granting the motion to set aside the default, the district court applied the good-cause standard of Rule 55 rather than Rule 60's excusable-neglect standard.

On appeal, the Plaintiffs contend that that an entry of default is a ministerial act performed by the district court clerk, *see* Fed. R. Civ. P. 55(a), and that Rule 55 applies

5

*only* to efforts to set aside these ministerial entries of default. In this case, however, after the clerk's entry of default, the district court granted Plaintiffs' motion for a default judgment and set a date for the damages hearing. The Plaintiffs therefore argue that because this case proceeded beyond the ministerial entry of default, the court should have analyzed the issue under Rule 60's excusable-neglect standard. We disagree.

Rule 55 contemplates a two-step procedure. The first step is the entry of default, which must be made by the clerk "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). The second step is the subsequent entry of a default *judgment*, which may be done by the clerk "[i]f the plaintiff's claim is for a sum certain or a sum that can be made certain by computation," Fed. R. Civ. P. 55(b)(1), but otherwise must be done by the district court, *see* Fed. R. Civ. P. 55(b)(2) ("In all other cases, the party must apply to the court for a default judgment. . . ."). As the Rule itself makes clear, however, the standard for setting aside a default does not turn on whether the clerk or the district court entered the order, but on whether the default judgment is *final*. *See* Fed. R. Civ. P. 55(c) ("The court may set aside an entry of default for good cause, and it may set aside a *final default judgment* under Rule 60(b). . . .") (emphasis added).

In this case, the district court issued an order directing that "judgment by default be entered against" Marriott. J.A. 2. That same order, however, recognized that the Plaintiffs were not seeking a sum certain and stated that "a hearing shall be scheduled to determine the amount of damages." J.A. 2-3. Because no damages were awarded, the district court's order was not a final judgment of default. *See Calderon v. Geico Gen. Ins.*, 754 F.3d 201,

6

207 (4th Cir. 2014) (explaining that "a judgment for the plaintiff that determines liability for, but does not fix the amount of, damages" is not a final judgment) (internal quotation marks omitted); *Ins. Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 847, 853 (4th Cir. 1992) ("[A] default judgment may not be entered without a full hearing unless the damages are liquidated or otherwise uncontested."). Thus, despite the fact that the district court captioned its order as a "default judgment," the order operated as nothing more than an entry of default, albeit one made by the court rather than the clerk. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1364 n.27 (11th Cir. 1997) ("When the amount of damages is in dispute, . . . only the court may enter judgment, and then only after determining the amount of damages. There can be no 'judgment' without a determination of relief. Thus, the document entitled 'default judgment' in this case is more properly termed simply a 'default.'") (citation omitted). Because no final judgment of default had been entered in this case, Rule 60 was inapplicable, and the district court properly applied Rule 55's good-cause standard when considering Marriott's motion to set aside the default.

The Plaintiffs argue that Marriott cannot show excusable neglect as required by Rule 60(b), but they do not contend that the district court erred in finding that Rule 55's good-cause standard was satisfied or that the court otherwise erred in applying the standards governing setting aside a default under Rule 55.[1] As we have explained, the district court

---

[1] *See Payne ex rel. Estate of Calzada v. Brake*, 439 F.3d 198, 204–05 (4th Cir. 2006) ("When deciding whether to set aside an entry of default, a district court should consider whether the moving party has a meritorious defense, whether it acts with reasonable promptness, the personal responsibility of the defaulting party, the prejudice to (Continued)

7

correctly proceeded under Rule 55 rather than Rule 60, and we therefore affirm the district court's decision to set aside Marriott's default.

III.

We turn now to the question of personal jurisdiction. Broadly speaking, "[t]he validity of an order of a federal court depends upon that court's having jurisdiction over both the subject matter and the parties." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982). Subject-matter jurisdiction -- an Article III requirement -- "functions as a restriction on federal power" and cannot be conferred on the court by the actions of the parties. *Id.* at 702. The requirement that the court have personal jurisdiction, however, springs not from Article III of the Constitution, but from the Due Process Clause. *See id.* Because the personal jurisdiction requirement "recognizes and protects an individual liberty interest," *id.,* the requirement may be waived by a defendant's "express or implied consent to the personal jurisdiction of the court," *id.* at 703.

Absent consent, the exercise of personal jurisdiction must comport with the requirements of the Due Process Clause: valid service of process, "as well as . . . 'minimum contacts' with the forum so that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 228 (4th Cir. 2019) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The nature and quantity of forum-state contacts required depends on whether the

---

the party, whether there is a history of dilatory action, and the availability of sanctions less drastic.").

8

case involves the exercise of "specific" or "general" jurisdiction. General jurisdiction permits the court to hear any and all claims against the defendant, regardless of where the claims arose or the plaintiff's citizenship. General jurisdiction may be exercised when the defendant has contacts with the forum jurisdiction that are "so constant and pervasive as to render it essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (internal quotation marks and alteration omitted). If the defendant does not have sufficient contacts to be at home in the forum, the court may exercise specific jurisdiction if the defendant has continuous and systematic contacts with the forum state and the claims at issue arise from those contacts with the forum state. *See id.* at 126-27. The plaintiffs contend that both specific and general jurisdiction are present in this case.

A.

We first consider the Plaintiffs' claim that Marriott has sufficient contacts with South Carolina to subject it to general jurisdiction in the state. Our analysis is guided by two relatively recent decisions from the Supreme Court – *Daimler* (cited above) and *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915 (2011).

In *Goodyear*, the plaintiffs were North Carolina residents whose sons died in a bus accident in France. Believing that the accident was caused by a defect in the bus tires, the plaintiffs filed suit in North Carolina state court against Goodyear USA and three of its subsidiaries. Goodyear USA was an Ohio corporation, and the subsidiary-defendants were foreign entities organized under the laws of and operating in Luxembourg, Turkey, and France. None of the subsidiary defendants had any contacts with the state of North Carolina. They did not design, manufacture, or advertise their products in the State; they

9

had no employees in the State; and they were not registered to do business in North Carolina. The subsidiary defendants did not sell or ship tires to North Carolina customers, but other Goodyear USA affiliates had distributed a small number of Goodyear tires in the state. The North Carolina Court of Appeals rejected the subsidiary-defendants' challenge to the assertion of general jurisdiction over them, concluding that the subsidiary-defendants' act of placing their products into the stream of commerce was sufficient to support jurisdiction.

The Supreme Court disagreed. While the "[f]low of a manufacturer's products into the forum . . . may bolster an affiliation germane to *specific* jurisdiction," 564 U.S. at 927, "the sales of [the subsidiary-defendants'] tires sporadically made in North Carolina through intermediaries" was not enough to support the exercise of general jurisdiction, *id.* at 929. "Under the sprawling view of general jurisdiction urged by respondents and embraced by the North Carolina Court of Appeals, any substantial manufacturer or seller of goods would be amenable to suit, on any claim for relief, wherever its products are distributed." *Id.* Instead, "general jurisdiction over foreign (sister-state or foreign-country) corporations" is limited to cases where "their affiliations with the State are so continuous and systematic as to render them essentially *at home in the forum State.*" *Id.* at 919 (emphasis added, internal quotation marks omitted). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.* at 924. As the Court recognized, the paradigm forums where corporations are fairly regarded as at home are the forums where it is incorporated and where it has its principal place of business. *See id.*

10

In *Daimler*, residents of Argentina filed an action in California district court against Daimler AG, a German corporation that manufactures Mercedes-Benz automobiles. The plaintiffs alleged that "during Argentina's 1976–1983 'Dirty War,' Daimler's Argentinian subsidiary . . . . collaborated with state security forces to kidnap, detain, torture, and kill" employees of the subsidiary, and they sought damages for human-rights violations. 571 U.S. at 121. The plaintiffs contended that California could exercise personal jurisdiction over Daimler by virtue of the California contacts of a different Daimler subsidiary, Mercedes–Benz USA, LLC (MBUSA), which had extensive contacts with California. *See id.* The Court assumed for the purposes of its decision that MBUSA's contacts with California were sufficient to render *MBUSA* at home in California and thus subject to general jurisdiction, and it also assumed that MBUSA's California contacts could be attributed to Daimler. *See id.* at 134, 136. But even with those assumptions, the Court found the contacts insufficient to make Daimler at home in California.

The Court emphasized that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there. 'For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.'" *Id.* at 137 (quoting *Goodyear*, 564 U.S. at 924). Echoing *Goodyear*, the Court held that a corporation may be fairly regarded as at home in the forum where it is incorporated and the forum where it has its principal place of business. *See id.* at 137. As the Court explained, "[t]hose affiliations have the virtue of being unique -- that is, each ordinarily indicates only one place -- as well as easily ascertainable. These bases afford plaintiffs

11

recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Id.* (citation omitted). Moreover, *Daimler* made it clear that only in the "exceptional case" could the contacts with another forum be "so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 139 n.19. "It is one thing to hold a corporation answerable for operations in the forum State, quite another to expose it to suit on claims having no connection whatever to the forum State." *Id.* (citation omitted).

The *Daimler* Court rejected the plaintiffs' assertion that general jurisdiction could be exercised "in every State in which a corporation engages in a substantial, continuous, and systematic course of business," describing the assertion as "unacceptably grasping." *Id.* at 138 (internal quotation marks omitted). The Court explained that the existence of continuous and systematic contacts with the forum, though required for the exercise of *specific* jurisdiction, was not sufficient to support the exercise of *general* jurisdiction. "[T]he inquiry under *Goodyear* is not whether a foreign corporation's in-forum contacts can be said to be in some sense continuous and systematic, it is whether that corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State." *Id*. at 138-39 (internal quotation marks and alteration omitted). The Court found the connections to California to be insufficient to support the exercise of general jurisdiction:

> Here, neither Daimler nor MBUSA is incorporated in California, nor does either entity have its principal place of business there. If Daimler's California activities sufficed to allow adjudication of this Argentina-rooted case in California, the same global reach would presumably be available in every other State in which MBUSA's sales are sizable. Such exorbitant

12

exercises of all-purpose jurisdiction would scarcely permit out-of-state defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.

*Id.* at 139 (internal quotation marks omitted).

Given the principles set out in *Goodyear* and *Daimler*, we have no difficulty concluding that Marriott's contacts with South Carolina are insufficient to make it "at home" in South Carolina, as is required for the exercise of general jurisdiction.

As previously discussed, Marriott's contacts with South Carolina are limited. Marriott has a Certificate of Authority to conduct business in the state. Of the 6,200 hotels in the Marriott system, only ninety (1.45%) are in South Carolina. Marriott, however, does not own any of those hotels; sixty-three are franchisees and the remaining twenty-seven are licensed or managed by Marriott. Marriott's interactive website is accessible in South Carolina, and it includes South Carolina in the drop-down menu used by customers when selecting their place of residence.

While these contacts certainly qualify as systematic and continuous, they are not substantial enough to "render [Marriott] essentially at home in the forum State." *Daimler*, 571 U.S. at 139. Marriott's South Carolina operations are very limited in scope and represent a small fraction of the company's overall operations. *See id.* at 139 n.20 ("[T]he general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-state contacts. . . . General jurisdiction instead calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide."). Because there is nothing that would distinguish Marriott's relationship with South Carolina from its relationship with any of the other states where it does business but where it is not incorporated or

13

headquartered, this is not the exceptional case for general jurisdiction contemplated by the *Daimler* Court. Indeed, accepting the Plaintiffs' jurisdictional arguments in this case would mean that Marriott would be subject to general jurisdiction in every state where its hotels are located. The Plaintiffs' argument is thus precisely the "unacceptably grasping" argument rejected by the *Daimler* Court. *Id.* at 138. As the Court explained, "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *Id.* at 139 n.20.

Accordingly, because Marriott's contacts with South Carolina are not sufficient to render it "at home" in South Carolina, the requirements for the exercise of contact-based general jurisdiction are not satisfied in this case.

B.

Even if Marriott's contacts with South Carolina are insufficient to support the exercise of general jurisdiction, the Plaintiffs contend that Marriott consented to general jurisdiction in South Carolina when it obtained a Certificate of Authority to conduct business in the state. *See Ins. Corp. of Ireland*, 456 U.S. at 703 (explaining that the requirement of personal jurisdiction may be waived by a defendant's "express or implied consent to the personal jurisdiction of the court").

South Carolina requires all foreign corporations to obtain a certificate of authority before conducting business in the state. *See* S.C. Code § 33-15-101(a) ("A foreign corporation may not transact business in this State until it obtains a certificate of authority from the Secretary of State."). Marriott complied with that requirement and operates under a properly issued certificate of authority. Under South Carolina law, "[a] foreign

14

corporation with a valid certificate of authority has the same but no greater rights and has the same but no greater privileges as, and . . . is subject to the same duties, restrictions, penalties, and liabilities now or later imposed on, a domestic corporation of like character." S.C. Code § 33-15-105(b). Because a South Carolina corporation is subject to general jurisdiction in South Carolina, *see Daimler*, 571 U.S. at 137, the Plaintiffs contend that under § 105(b), foreign corporations who chose to obtain a certificate of authority in South Carolina have consented to general jurisdiction in South Carolina. We disagree.

The Plaintiffs' argument is based on *Pennsylvania Fire Insurance Co. of Philadelphia v. Gold Issue Mining & Milling Co.*, 243 U.S. 93 (1917), and *Robert Mitchell Furniture Co. v. Selden Breck Construction Co.*, 257 U.S. 213 (1921), both decided well before the development of the minimum-contacts-focused approach expressed by the Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).

In *Pennsylvania Fire*, the Supreme Court held that a foreign-corporation defendant consented to general jurisdiction in Missouri by complying with a state law requiring it to obtain a business license and execute a power of attorney agreeing that service on its representative was the equivalent of personal service. The Court explained that because the Supreme Court of Missouri had held that the statute created consent to general jurisdiction, the defendant accepted that condition by complying with the statute. *See* 243 U.S. at 95-96.

However, the Court in *Robert Mitchell Furniture* held that a foreign corporation did *not* consent to general jurisdiction by complying with a state statute requiring appointment of an agent for service of process. The Court explained that "[u]nless the state law either

15

expressly or by local construction gives to the appointment a larger scope, we should not construe it to extend to suits in respect of business transacted by the foreign corporation elsewhere, at least if begun, as this was, when the long previous appointment of the agent is the only ground for imputing to the defendant an even technical presence." 257 U.S. at 216.

Following *Pennsylvania Fire* and *Robert Mitchell Furniture*, some circuits have concluded that a foreign corporation obtaining a business license or appointing an agent for service of process in a state has consented to general jurisdiction in the state if state law so provides. *See, e.g.*, *Waite v. AII Acquisition Corp.*, 901 F.3d 1307, 1319 (11th Cir. 2018) (explaining that under *Pennsylvania Fire* and *Robert Mitchell Furniture*, "whether appointing an agent for service of process subjects a foreign defendant to general personal jurisdiction in the forum depends upon the state statutory language and state court decisions interpreting it"); *King v. Am. Family Mut. Ins. Co.,* 632 F.3d 570, 576 (9th Cir. 2011) (*Pennsylvania Fire* and *Robert Mitchell Furniture* "stand for the proposition that federal courts must, subject to federal constitutional restraints, look to state statutes and case law in order to determine whether a foreign corporation is subject to personal jurisdiction in a given case because the corporation has appointed an agent for service of process").

In *Ratliff v. Cooper Labs., Inc.*, 444 F.2d 745 (4th Cir. 1971), however, this court rejected a claim that a foreign corporation's compliance with an earlier version of South Carolina's domestication statute subjected it to general jurisdiction in South Carolina:

> We think the application to do business and the appointment of an agent for service to fulfill a state law requirement is of no special weight in the present context. Applying for the privilege of doing business is one thing, but the

16

actual exercise of that privilege is quite another. *See International Shoe Co. v. Washington, supra*, 326 U.S. at 319, 66 S. Ct. 154. The principles of due process require a firmer foundation than mere compliance with state domestication statutes.

*Id.* at 748.

*Ratliff* did not cite *Pennsylvania Fire* or otherwise acknowledge the line of cases holding that obtaining a business license or appointing an agent for service of process amounts to consent to general jurisdiction. Nonetheless, given the court's treatment of the business license as simply one of the defendant's contacts with the state and its reliance on *International Shoe* when concluding that due process required more than mere compliance with a state's domestication statute, *Ratliff* seems to have implicitly concluded that the *Pennsylvania Fire* line of cases had been superseded by *International Shoe*'s minimum-contacts approach to personal jurisdiction. *See Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 181-82 (5th Cir. 1992) (relying on *Ratliff* to reject claim that foreign corporation's certification to do business in forum state automatically conferred general jurisdiction); *id.* at 183 ("To assert, as plaintiffs do, that mere service on a corporate agent automatically confers *general jurisdiction* displays a fundamental misconception of corporate jurisdictional principles. This concept is directly contrary to the historical rationale of *International Shoe* and subsequent Supreme Court decisions.").

Moreover, we find it difficult to reconcile the *Pennsylvania Fire* approach with the modern view of general jurisdiction expressed in the Supreme Court's recent cases. *See BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1557 (2017) (questioning the persuasiveness of cases "decided before this Court's transformative decision on personal jurisdiction in

17

*International Shoe"*); *Daimler*, 571 U.S. at 138 n.18 (suggesting that certain personal-jurisdiction cases "decided in the era dominated by [the] territorial thinking [of *Pennoyer v. Neff*, 95 U.S. 714 (1877)] should not attract heavy reliance today"); *see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 638 (2d Cir. 2016) ("*Pennsylvania Fire* is now simply too much at odds with the approach to general jurisdiction adopted in *Daimler* to govern as categorically as [the plaintiff] suggests . . . ."). Given the number of states that subject foreign corporations to domestication requirements, foreign corporations would likely be subject to general jurisdiction in every state where they operate -- a result directly at odds with the views expressed by the Court in *Daimler*. *See Daimler*, 571 U.S. at 138 (rejecting as "unacceptably grasping" the claim that general jurisdiction exists "in every State in which a corporation engages in a substantial, continuous, and systematic course of business") (internal quotation marks omitted); *id.* at 139 n.20 ("A corporation that operates in many places can scarcely be deemed at home in all of them. Otherwise, 'at home' would be synonymous with 'doing business' tests framed before specific jurisdiction evolved in the United States.").

However, even if we assume that *International Shoe* and *Daimler* had no effect on the consent-to-general-jurisdiction rule set out in *Pennsylvania Fire* and *Robert Mitchell Furniture*, we conclude that under the rules set out in those cases, Marriott did not consent to general jurisdiction by complying with South Carolina's domestication statute.

Under the rules set out in *Pennsylvania Fire* and *Robert Mitchell Furniture*, obtaining the necessary certification to conduct business in a given state amounts to consent to general jurisdiction in that state only if that condition is explicit in the statute or the state

18

courts have interpreted the statute as imposing that condition. S.C. Code § 33-15-105 states that a foreign corporation doing business in South Carolina under a certificate of authority "is subject to the same duties, restrictions, penalties, and liabilities" as a domestic corporation. Because domestic corporations are subject to general jurisdiction in South Carolina, the Plaintiffs contend that under § 33-15-105, foreign corporations operating under a certificate of authority are likewise subject to general jurisdiction in South Carolina. We do not agree with the Plaintiffs' reading of South Carolina law.

S.C. Code § 33-15-101 establishes the requirement that foreign corporations transacting business in the state obtain a certificate of authority, *see id.* § 33-15-101(a), and provides a list of activities that do not amount to transacting business, *see id.* § 33-15-101(b). The South Carolina Reporters' comments accompanying that statute instruct that "[a] corporation can be qualified to do business in South Carolina and have appointed an agent for service of process but *still not be conducting sufficient activities to be subject to suit here*." S.C. Code § 33-15-101, S.C. Reporters' Comments § 2 (emphasis added). The position taken in the statutory commentary thus is directly contrary to the Plaintiffs' assertion that under South Carolina law, a foreign corporation consents to general jurisdiction by obtaining a certificate of authority to transact business.

The Plaintiffs' position has also been rejected by the Court of Appeals of South Carolina. In *Builder Mart of America, Inc. v. First Union Corp.*, 563 S.E.2d 352 (S.C. Ct. App. 2002), *overruled in part on other grounds by Farmer v. Monsanto Corp.*, 579 S.E.2d 325 (S.C. 2003), the court held that a North Carolina bank that did not conduct business in South Carolina was not subject to personal jurisdiction in South Carolina simply because

19

it had registered with the South Carolina Board of Financial Institutions and appointed an agent for service of process. *See id.* at 355. In reaching that conclusion, the court relied on the statutory commentary to § 33-15-101 quoted above and on this court's decision in *Ratliff. See id.*

Although neither *Builder Mart* nor the statutory commentary speak in terms of consent to general jurisdiction, they nonetheless make clear that a certificate of authority does not automatically subject a foreign corporation to jurisdiction in South Carolina courts and that jurisdiction instead depends on sufficient South Carolina contacts by the foreign corporation. That is sufficient to close the door to the Plaintiffs' consent argument.[2] Even under the rules set out in *Pennsylvania Fire*, obtaining a certificate of authority operates as consent to general jurisdiction only if state law so provides. As indicated by *Builder Mart* and the statutory commentary, South Carolina law *does not* make consent to general jurisdiction a consequence of obtaining a certificate of authority to transact business. The district court therefore properly concluded that Marriott did not consent to the exercise of general jurisdiction by obtaining the certificate of authority.[3]

---

[2] But to the extent there is any doubt, § 33-15-105(d) also provides that "[b]y obtaining a certificate of authority, the foreign corporation agrees to be subject to the jurisdiction of the Department of Revenue and the courts of this State to determine its South Carolina tax liability." S.C. Code § 33-15-105(d). This explicit statutory requirement that foreign corporations consent to jurisdiction in relation to certain tax issues would seem to exclude consent to general jurisdiction. To read otherwise would render § 33-15-105(d) superfluous.

[3] In support of their consent argument, the Plaintiffs point to the official commentary to § 33-15-107, which states that a "foreign corporation that obtains a certificate of authority in a state thereby agrees that it is amenable to suit in the state." S.C. (Continued)

20

C.

We turn now to the Plaintiffs' claim that South Carolina may properly exercise specific jurisdiction in this case. The Due Process clause permits the exercise of specific personal jurisdiction over a defendant if "the defendant [has] purposefully established minimum contacts in the forum State such that it should reasonably anticipate being haled into court there." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (internal quotation marks and alteration omitted). These requirements are met, and specific jurisdiction may be exercised, if "the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation and internal quotation marks omitted); *see Perdue Foods*, 814 F.3d at 189 (When determining whether specific jurisdiction exists, "we consider (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3)

---

Code. Ann. § 33-15-107, Official Comment. In the Plaintiffs' view, a foreign corporation that agrees it is "amenable to suit in South Carolina" has also agreed to submit to general jurisdiction in the state. We disagree. In light of the statutory commentary to § 33-15-101 quoted above, which makes it clear that a certificate of authority does not automatically confer jurisdiction, the Plaintiffs' conflation of "amenable to suit" to "general jurisdiction" is clearly incorrect. We believe the phrase "amenable to suit in the state" in this context is best understood as amenable to *service of process* in the state. That understanding of the phrase maintains consistency with the § 101 commentary, and it makes the most sense contextually, given that § 33-15-107, on which the Plaintiffs rely, involves a foreign corporation's obligation to maintain a registered agent in South Carolina. *See* S.C. Code § 33-15-107. The commentary to § 107 thus does not affect our conclusion that under South Carolina law, a foreign corporation does not consent to general jurisdiction by obtaining a certificate of authority to transact business in the state.

21

whether the exercise of personal jurisdiction would be constitutionally reasonable.")
(internal quotation marks omitted).

1.

Taking things in reverse order, we begin with the requirement that the litigation must arise out of Marriott's contacts with South Carolina.

"In order for a state court to exercise specific jurisdiction, the *suit* must arise out of or relate to the defendant's contacts with the *forum*." *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1780 (2017) (internal quotation marks and alterations omitted).

> In other words, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation. For this reason, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.

*Id.* (citation, internal quotation marks and alteration omitted). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.* at 1781.

Marriott's business activity in South Carolina is not insignificant, as it franchises, licenses, or manages ninety hotels in the state. Those activities, however, have nothing to do with the claims asserted by the Plaintiffs in this action. That is, the claims asserted after Bud Fidrych's injury in a Marriott-affiliated hotel in Milan do not in any sense "arise out of or relate to" Marriott's connections to the hotels located in South Carolina. Because the Plaintiffs' claims do not arise from them, Marriott's hotel-related connections to South Carolina are not relevant to our specific-jurisdiction inquiry. *See id.* at 1781.

22

The only other action by Marriott that is arguably relevant is its operation of its website. As previously mentioned, Marriott operates a website that is accessible in South Carolina and includes South Carolina on a drop-down menu used to select a customer's place of residence. Fidrych asserts in his affidavit that he used the website to review the Boscolo and that what he saw made him comfortable with the Boscolo, particularly given the absence of any disclaimers of responsibility by Marriott for issues involving the Boscolo. Although Fidrych did not make his own reservation, his complaint alleges that the travel agent used by the Gulfstream team did use Marriott's website to make the team's reservations at the Boscolo.

Whether the use of the website to make the reservations means that Fidrych's personal injury claims arise from or relate to Marriott's operation of the website is a difficult question.[4] Under similar factual circumstances, the Eleventh Circuit has rejected that argument. *See Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210 (11th Cir. 2009). The plaintiff in *Oldfield* was a Florida resident who learned about a resort in Costa Rica through the resort's website and used the website to make a reservation. While staying at the resort, the plaintiff chartered an independently owned boat for a fishing trip and was

---

[4]     We note that the Supreme Court recently granted *certiorari* to address whether the arising-out-of requirement is satisfied in cases where the defendant's forum contacts did not cause the plaintiff's claims. *See Ford Motor Co. v. Montana Eighth District Court*, S. Ct. Docket No. 19-368, Question Presented ("Whether the 'arise out of or relate to' requirement is met when none of the defendant's forum contacts caused the plaintiff's claims, such that the plaintiff's claims would be the same even if the defendant had no forum contacts."), consolidated with *Ford Motor Co. v. Bandemer*, S. Ct. Docket No. 19-369.

23

injured through the negligence of the boat captain. The plaintiff filed suit against the resort in federal district court in Florida, alleging that the resort was legally responsible for the captain's negligence. The Eleventh Circuit concluded that the district court lacked personal jurisdiction over the resort because the plaintiff's injuries did not arise out of his use of the website. *See id.* at 1223-24 ("A finding that such a tenuous relationship between [the resort's] relevant contacts and the negligence of the captain who was not employed or controlled by [the resort] somehow satisfied the relatedness requirement would not only contravene the fairness principles that permeate the jurisdictional due process analysis, but would also interpret the requirement so broadly as to render it virtually meaningless.").

We need not definitively resolve the issue in this case, however. As we explain below, even if we assume that Fidrych's claims arose from or were sufficiently related to the use of Marriott's website, Marriott's operation of a website accessible in South Carolina is insufficient to satisfy the minimum-contacts requirement of the personal-jurisdiction inquiry.

2.

For the exercise of specific jurisdiction to be permissible, "the defendant [must have] purposefully directed his activities at residents of the forum." *Burger King*, 471 U.S. at 472 (internal quotation marks omitted). "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.* at 475 (citations and internal quotation marks omitted).

24

> [W]here the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Id.* at 475-76 (citations and internal quotation marks omitted); *see ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997) ("With respect to specific jurisdiction, the touchstone remains that an out-of-state person have engaged in some activity purposefully directed toward the forum state. The contacts related to the cause of action must create a substantial connection with the forum state . . . .") (internal quotation marks and alteration omitted).

In this case, none of the wrongs Marriott is alleged to have committed took place in South Carolina. The Plaintiffs contend the website booking created a contract between Marriott and Bud Fidrych and that Marriott breached an implied warranty of safety and fitness for intended purpose by providing a defective shower door. They allege that Marriott was negligent by failing to regularly inspect its properties and discover the defective shower door. They also assert three claims based on Italian law: that Marriott breached a contractual duty to maintain a safe hotel; that Marriott is liable because the defective shower door was in the exclusive control of the Boscolo, which operated as Marriott's agent; and that Marriott is responsible for the general negligence of its agent. Thus, none of Marriott's actions or omissions that form the basis of the Plaintiffs' claims took place in South Carolina or were otherwise directed at South Carolina residents. Accordingly, one of the most frequent bases for the exercise of specific jurisdiction -- an

25

activity by the defendant in the forum state -- is absent in this case. *See Bristol-Myers Squibb*, 137 S. Ct. at 1781.

Moreover, as discussed above, Marriott's qualification to do business in South Carolina and its involvement in ninety hotels in the state have nothing to do with the claims asserted in this case and thus are not relevant to our inquiry. *See Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("For a State to exercise jurisdiction consistent with due process, the defendant's *suit-related conduct* must create a substantial connection with the forum State.") (emphasis added). Accordingly, we are again left with Marriott's operation of its website as the only arguable jurisdictional hook connecting this case to South Carolina. The question, then, is whether Marriott's operation of the website amounts to activity purposefully directed at South Carolina residents.

While Marriott obviously uses its website to engage in commercial transactions, the website does not target South Carolina residents for commercial transactions any more than it targets any other state. Instead of targeting any particular state, the website makes itself available to any one who seeks it out, regardless of where they live. In our view, the mere fact that the website is accessible in a given state does not mean that Marriott is targeting its activities at that state. *See ESAB*, 126 F.3d at 625 (rejecting claim of specific jurisdiction where defendant did not direct its activities at South Carolina but instead "focused its activities more generally on customers located throughout the United States and Canada without focusing on and targeting South Carolina").

As the Plaintiffs point out, however, the website is interactive, not passive. The interactivity of a website is a jurisdictionally relevant fact. *See ALS Scan, Inc. v. Digital*

26

*Serv. Consultants, Inc*., 293 F.3d 707, 713-14 (4th Cir. 2002). In *ALS Scan*, we considered

the jurisdictional implications of internet-based communications and activity. Formulating

principles for determining "when it can be deemed that an out-of-state citizen, through

electronic contacts, has conceptually 'entered' the State via the Internet for jurisdictional

purposes," *id.* at 713, we adopted the approach set out in *Zippo Manufacturing Co. v. Zippo*

*Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). In *Zippo*, the court concluded that

> the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id.* at 1124 (citations omitted).[5]

---

[5] The internet we know today is very different from the internet of 1997, when *Zippo* was decided. According to *Zippo*, in 1997 the internet was used "by over 30 million individuals, corporations, organizations, and educational institutions worldwide." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1123 (W.D. Pa. 1997). In 2000, the numbers of internet users worldwide had jumped to 361 million. And by 2011, the internet had almost 2 *billion* users. *See* Zoe Niesel, *#personaljurisdiction: A New Age of Internet Contacts*, 94 Ind. L.J. 103, 127 n.197 (Winter 2019). When *Zippo* was decided, desktop computers provided the primary manner of accessing the internet; now, with the advent of smart phones, people carry the internet with them everywhere. *See id.* at 127 (noting that (Continued)

27

Although Marriott clearly does business over the internet, it is not using its website to enter into long-term contracts "that involve the knowing and repeated transmission of computer files over the Internet." *Id.* We therefore conclude that Marriott's interactive website best fits in *Zippo*'s "middle ground," where additional analysis is required to answer the jurisdictional question.

In our view, the level of interactivity of a website like Marriott's is not enough, on its own, to make the website a sufficient basis to support the exercise of specific jurisdiction. The interactivity of the website is relatively limited -- it permits customers to input their travel dates to view available hotels and to book rooms online, which requires them to provide personal and financial information. The website is not used to create a continuing, back-and-forth relationship between Marriott and the website user; it is used to facilitate the making of a one-off hotel reservation. The website is thus in many ways the digital equivalent of a toll-free telephone number, providing a simple, cost-free way for customers to contact the company.

---

more people now access the internet through a mobile device than through desktop computers). Moreover, on today's internet, "[i]t is an extraordinarily rare website" that is *not* interactive at some level. *Kindig It Design, Inc. v. Creative Controls, Inc.*, 157 F. Supp. 3d 1167, 1174 (D. Utah 2016). Given the pace of technological advancement since *Zippo* and the changes in the way the internet is used, a re-evaluation of the utility of the *Zippo* approach may be prudent. Until then, the *Zippo* approach remains binding. *See United States v. Bush*, 944 F.3d 189, 195 (4th Cir. 2019) ("[T]he panels of this Court are generally bound by our precedent, and this panel is not entitled to reject or alter an earlier panel's ruling, in the absence of a controlling en banc ruling or Supreme Court decision.").

28

Moreover, if we attach too much significance on the mere fact of interactivity, we risk losing sight of the key issue in a specific jurisdiction case -- whether "the defendant has *purposefully directed* [its] activities at residents of the forum." *Burger King*, 471 U.S. at 472 (emphasis added; internal quotation marks omitted). The *ALS Scan* court, of course, recognized purposeful availment as the touchstone of the minimum-contacts analysis and made it the first prong of its re-formulated *Zippo* analysis:

> [A]dopting and adapting the *Zippo* model, we conclude that a State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) *directs* electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.

*ALS Scan*, 293 F.3d at 714 (emphasis added). Marriott obviously intends to engage in commercial transactions through the website. Nonetheless, the website is not directed at the residents of any particular forum. *See id.* at 715 (finding no jurisdiction in Maryland in part because the defendant "did not direct its electronic activity specifically at any target in Maryland").

The Plaintiffs focus much of their attention on the fact that the website includes South Carolina as an option in the drop-down menu used by customers to select their state of residence when making reservations. South Carolina's inclusion in a list of every other state in the country (and every other country in the world) shows that Marriott was willing to accept reservations from South Carolina residents, but it does not show that Marriott was targeting South Carolina residents through its website. To the contrary, the list of options confirms that the website was accessible to all but targeted at no one in particular. *See*

29

*NexLearn, LLC v. Allen Interactions, Inc.*, 859 F.3d 1371, 1378 (Fed. Cir. 2017) ("Allen's inclusion of Kansas in its dropdown of all states on its website is not enough to subject Allen to jurisdiction in Kansas. Allen's address selector may indicate its amenability to selling ZebraZapps to Kansas residents, but it does not establish minimum contacts arising out of or related to the infringement claim.").  The fact that Marriott's website uses drop-down menus that include South Carolina simply does nothing to strengthen the jurisdictionally relevant connections between Marriott and South Carolina.

Accordingly, even though Marriott's website is interactive, Marriott does not use it to target South Carolina residents in particular.  *See Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 401 (4th Cir. 2003) ("[W]hen CPC set up its generally accessible, semi-interactive Internet website, it did not thereby direct electronic activity into Maryland with the manifest intent of engaging in business or other interactions within that state in particular."); *see also Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802–03 (7th Cir. 2014) ("[T]he operation of an interactive website does not show that the *defendant* has formed a contact with the forum state.").  The general availability of the website to South Carolina residents thus does not create the substantial connection to South Carolina necessary to support the exercise of jurisdiction.  *See Walden*, 571 U.S. at 284 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a *substantial connection* with the forum State.") (emphasis added).

We recognize, of course, that there are other South Carolina connections in this case. For example, the Fidryches are South Carolina residents, and the effects of Bud's injury

are felt in South Carolina.  As the Supreme Court has made clear, however, the connection between the defendant and the forum "must arise out of contacts that the defendant *himself* creates with the forum State."  *Id.* (internal quotation marks omitted).  "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts *cannot be decisive* in determining whether the defendant's due process rights are violated."  *Id.* at 285 (emphasis added; internal quotation marks omitted); *see ESAB*, 126 F.3d at 626 ("Although the place that the plaintiff feels the alleged injury is plainly relevant to the inquiry, it must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld.").

We therefore conclude that Marriott's case-related contacts with South Carolina are too tenuous and too insubstantial to constitutionally permit the exercise of specific jurisdiction over Marriott.[6]  *See Walden*, 571 U.S. at 284.  Because neither general nor specific jurisdiction may be exercised in this case, the district court properly granted Marriott's motion to dismiss for lack of personal jurisdiction.

## IV.

Finally, we turn to the Plaintiffs' claim that the district court erred by denying their motion for sanctions.

## A.

---

[6]    If we were to conclude otherwise, then every hotel operator would be subject to personal jurisdiction in the state of residence of every guest who used the hotel's website to make the reservation.  A private guide offering walking tours of Paris would likewise be subject to personal jurisdiction in every state where his customers live if they used his website to book the tour.

31

"Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (citation and internal quotation marks omitted); *see Life Techs. Corp. v. Govindaraj*, 931 F.3d 259, 267 (4th Cir. 2019) (explaining that district courts "have the inherent power to order sanctions to preserve the integrity of the judicial process and to punish bad-faith conduct intended to delay or disrupt the course of litigation or to impede enforcement of a court order") (internal quotation marks omitted). One of the sanctions available to a district court is an award of attorney's fees "instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." *Goodyear*, 137 S. Ct. at 1186.

In its order setting aside Marriott's default, the district judge originally assigned to the case (Judge Duffy) noted the possibility of awarding sanctions to compensate the plaintiffs for the costs they incurred as a result of Marriott's failure to answer. *See* J.A. 55 ("[T]he Fourth Circuit has looked approvingly on an award of attorney's fees and costs to the party opposing the motion to set aside the entry of default. . . . The Fidryches are invited to suggest appropriate alternative sanctions to default judgment, and the Court's example of attorney's fees is illustrative only."). The plaintiffs subsequently filed a motion seeking more than $86,000 in attorney's fees and costs.

After the motion was filed, the case was transferred to a different district judge (Judge Hendricks), who denied the Plaintiffs' motion for sanctions in the same order that

32

granted Marriott's motion to dismiss for lack of personal jurisdiction. When denying sanctions, Judge Hendricks concluded that the requested amount was "excessive, and that Plaintiffs have not shown an adequate causal link between the default judgment and the total requested fees, whether incurred or paid." J.A. 252.

B.

Before considering the Plaintiffs' challenges to the district court's decision, we pause to address one of Marriott's arguments. Marriott contends that regardless of the district court's analysis, the denial of the Plaintiffs' motion must be affirmed because any sanctions award would be void for lack of personal jurisdiction. *See Ins. Corp. of Ireland*, 456 U.S. at 701 ("The validity of an order of a federal court depends upon that court's having jurisdiction over both the subject matter and the parties."); *Wells Fargo Bank, N.A. v. AMH Roman Two NC, LLC*, 859 F.3d 295, 299 (4th Cir. 2017) ("An order is void only if the court lacked personal or subject matter jurisdiction or acted contrary to due process of law.") (internal quotation marks omitted). We disagree. Even if a judgment on the merits of the Plaintiffs' claims against Marriott would be void for lack of personal jurisdiction, that does not mean that the district court lacks jurisdiction to impose sanctions on Marriott. *See Willy v. Coastal Corp.*, 503 U.S. 131 (1992); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990).

In *Cooter & Gell*, the district court imposed Rule 11 sanctions on a plaintiff *after* the plaintiff voluntarily dismissed the complaint. Before the Supreme Court, the plaintiff argued that the voluntary dismissal deprived the district court of jurisdiction over the action and thus rendered the court powerless to impose sanctions. The Supreme Court disagreed,

33

explaining that "a federal court may consider collateral issues after an action is no longer pending." 496 U.S. at 395. The Court's previous cases had already established that proceedings seeking attorney's fees and costs or seeking sanctions for criminal contempt were independent of the original proceeding, and that fees could be awarded and contempt sanctions imposed "even years after the entry of a judgment on the merits." *Id.* (internal quotation marks omitted). The Court held that the same analysis applied to proceedings seeking sanctions under Rule 11:

> Like the imposition of costs, attorney's fees, and contempt sanctions, the imposition of a Rule 11 sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate. Such a determination may be made after the principal suit has been terminated.

*Id.* at 396.

Building on its decision in *Cooter & Gell*, the Supreme Court in *Willy* upheld Rule 11 sanctions imposed by the district court even though it was later determined that the court lacked subject-matter jurisdiction over the case. *See* 503 U.S. at 138. The Court explained that the lower court's "interest in having rules of procedure obeyed . . . does not disappear" even if it is later determined that the court lacked jurisdiction. *Id.* at 139. "[T]here is no constitutional infirmity under Article III in requiring those practicing before the courts to conduct themselves in compliance with the applicable procedural rules [or allowing] the courts to impose Rule 11 sanctions in the event of their failure to do so." *Id.*; *see Barlow v. Colgate Palmolive Co.*, 772 F.3d 1001, 1009 (4th Cir. 2014) (en banc) (applying *Cooter & Gell* to conclude that "district courts have jurisdiction to decide Rule 11 sanctions

34

motions on the merits, even when they are filed after the underlying action is remanded to state court").

As these cases establish, a court's power to resolve collateral issues extends beyond its power to resolve the underlying case. Because sanction proceedings are collateral to the merits of the underlying case, an otherwise proper sanction award may be imposed even if the court lacks jurisdiction to enter a judgment on the merits against the sanctioned party. Accordingly, we reject Marriott's suggestion that we must affirm the district court's denial of sanctions on the alternative ground that the absence of personal jurisdiction over Marriott precludes an award of sanctions.

C.

We turn now to the Plaintiffs' challenges to the district court's denial of sanctions. We review the district court's decision on a request for sanctions for abuse of discretion. *See Cooter & Gell*, 496 U.S. at 405; *Barlow*, 772 F.3d at 1007.

The Plaintiffs contend the district court abused its discretion by denying sanctions. They argue that case law from this Court recognizes an award of attorney's fees as a less drastic alternative to default judgment, *see Colleton Prep. Acad., Inc. v. Hoover Univ., Inc.*, 616 F.3d 413, 418 (4th Cir. 2010); *Augusta Fiberglass Coatings, Inc. v. Fodor Contracting Corp.*, 843 F.2d 808, 811 (4th Cir. 1988), and that the district court failed to properly consider those cases or Judge Duffy's invitation to the Plaintiffs' to file a motion seeking a fee award. They also argue that by finding the amount requested to be excessive, the district court implicitly concluded that some portion of their requested fees was reasonable,

and that she abused her discretion by not awarding fees in an amount that she found reasonable.

As indicated above, the district court's analysis of the sanctions question was quite abbreviated, and the court disposed of the substance of the issue in a single sentence. *See* J.A. 252. We need more explanation to conduct meaningful appellate review of the court's disposition of the motion.

Although the district court found the Plaintiffs' request excessive, it did not explain what it found to be excessive. We therefore do not know whether the court believed it was the hourly rates that were excessive or the total number of hours billed. Moreover, as the Plaintiffs argue, the district court's conclusion that the requested fees were excessive seems to reflect an implicit conclusion that some lesser award would *not* be excessive. The district court, however, did not explain why it declined to award fees in a lesser, non-excessive amount, or why it did not at least require the Plaintiffs to submit an amended motion that better supported the requested award.

There may be many cases where a short explanation of the district court's view of the issue will be sufficient. *See, e.g.*, *Miltier v. Beorn*, 896 F.2d 848, 855 (4th Cir. 1990) ("When the motion for sanctions is foolish, or when the reasons for denying a colorable motion are apparent from the record, the judge need not belabor the obvious.") (internal quotation marks omitted), *overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825 (1994). In this case, however, there are too many issues raised by the Plaintiffs' request for sanctions for this court to assume it understands the basis for the district court's ruling.

36

For example, because the district court denied the requested sanctions as excessive rather than unwarranted, it would appear that the district court implicitly concluded that Marriott engaged in conduct that was sanctionable.[7] Sanctions may be awarded only in the face of misconduct of some sort. *See, e.g., Goodyear*, 137 S. Ct. at 1186 (Courts have inherent authority "to fashion an appropriate sanction for *conduct which abuses the judicial process*") (emphasis added; internal quotation marks omitted). While this Court has noted the general propriety of a fee award when a default judgment is set aside, the Supreme Court has explained that a defendant who believes personal jurisdiction is lacking is "free to ignore the judicial proceedings, risk a default judgment, and then challenge that judgment on jurisdictional grounds in a collateral proceeding." *Ins. Corp. of Ireland*, 456 U.S. at 706. Under the circumstances of this case, then, it is not entirely clear to us that Marriott committed any sanctionable misconduct simply by failing to timely answer the complaint. *See Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) ("[W]e have said that civil contempt should not be resorted to where there is a *fair ground of doubt* as to the wrongfulness of the defendant's conduct.") (internal quotation marks and alteration omitted).[8]

---

[7] Although Judge Duffy invited the Plaintiffs' to seek an award of attorney's fees, he did not explicitly address the question of misconduct.

[8] This opinion should not be understood as implicitly determining that misconduct has or has not occurred; we leave that question, and any other related questions that may arise, for resolution by the district court on remand.

Because we cannot determine the district court's basis for denying the Plaintiffs' motion for sanctions, we vacate that part of the district court's order and remand for reconsideration of the sanctions request. While the district court need not explain its analysis in great detail, it must provide an explanation sufficient to reveal the basis for its rulings so that we, in turn, have a sufficient basis for our review of the court's ultimate decision. *See Miltier*, 896 F.2d at 855 ("[I]n cases where the circumstances and the record do not clearly reflect the reasons for the district court's disposition of a Rule 11 motion, we have remanded with instructions that the district court make findings of fact concerning the frivolousness of the non-movant's action."); *cf. United States v. Engle*, 592 F.3d 495, 504 (4th Cir. 2010) ("Because the district court's explanation of its decision to vary significantly from the Guidelines' sentencing recommendation is insufficient to permit meaningful appellate review, we must vacate the sentence and remand for . . . further proceedings.").

V.

To summarize, we conclude that Marriott is not subject to general jurisdiction in South Carolina because its contacts with the state are not sufficient to render it "at home" in South Carolina, and that Marriott did not consent to general jurisdiction by obtaining a certificate of authority to transact business in South Carolina. We also conclude that Marriott is not subject to specific jurisdiction in South Carolina because Marriott's case-related contacts with South Carolina are not substantial enough to satisfy the requirements of due process. We therefore affirm the district court's dismissal of the action for lack of personal jurisdiction. As to the denial of the Plaintiffs' motion for sanctions, we find the

district court's explanation of its discretionary ruling insufficient to permit meaningful appellate review. We therefore vacate the district court's denial of sanctions and remand that issue for reconsideration by the district court and to give the district court an opportunity to better explain the reasoning behind its decision.

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED*