**Paul Anthony COOPER, Plaintiff-Appellee,**

v.

**S. DYKE, Officer; J.R. Markert, Officer; C. Morseberger, Officer, Defendants-Appellants. (Two Cases)**

Nos. 86–1562(L), 86–1654.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 7, 1987.

Decided March 18, 1987.

John A. Austin, Asst. Co. Atty. (Malcolm F. Spicer, Jr., Co. Atty., Towson, Md., on brief) for appellants.

Mark S. Dachille (Mark H. Kolman, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, Md., on brief) for appellee.

Before WINTER, Chief Judge, PHILLIPS, Circuit Judge, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

HARRISON L. WINTER, Chief Judge:

Plaintiff Paul Anthony Cooper sued Baltimore County Police Officers Dyke, Markert and Morseberger for their alleged deliberate indifference to plaintiff's serious medical needs, in violation of 42 U.S.C. § 1983, and for the pendant state claims of false arrest and negligent provision of medical care. The district court granted defendants' motion for directed verdict on the negligence count, but submitted the other two causes of action to the jury.

The jury awarded Cooper $75,300 on the § 1983 claim ($25,200 in compensatory damages and $50,100 in punitive damages), split equally among the three defendants. Nominal damages of $1 each were assessed against Dyke and Markert on the claim for false arrest (with which Morseberger was not charged). The district court awarded $36,240.01 to plaintiff's attorneys for their costs, expenses and fees, pursuant to 42 U.S.C. § 1988. Defendants appeal both awards.

Defendants contend that the district court erred in denying their motions for a directed verdict and judgment notwithstanding the verdict, that the jury instructions were flawed in several respects, that irregularities in the jury's deliberation process necessitate reversal, and that the attorneys fee award was improperly calculated. We find no merit in these contentions, and thus affirm.

## I.

Shortly before 3:00 a.m. on December 18, 1982, Paul Cooper, a sixteen year old boy, and several friends were involved in an altercation at Skateland Roller Rink in Owings Mills, Maryland. Cooper received a gunshot wound in the upper chest, under his left arm; his friend James Hill was shot in the hand. Cooper, Hill and others left the area in a van which was soon thereafter stopped by Officers Dyke and Markert. Although several occupants of the van quickly fled the scene, Cooper and Hill

walked toward Officer Dyke and told him that they had each been shot.

Because of Hill's visible injury and Cooper's complaints, Officer Dyke summoned an ambulance. The paramedics arrived within a few minutes and began to examine the boys. During this time, several busloads of people leaving Skateland were stopped by the roadblock set up by the police. The gathering crowd became increasingly disruptive and started threatening the boys and officers. Officer Markert testified that the police "were afraid of having almost a full-scale riot.... [events had] escalated very quickly ... to what was a very volatile situation...." When several members of the crowd came up behind the paramedics, screaming that they were going to kill one of the boys, the paramedics interrupted their examination and retreated toward the ambulance until the police regained control of the situation.

One of the paramedics who subsequently returned to examine Cooper stated that they did "[t]he best we could under the conditions." Those conditions, however, included very poor lighting, cold weather, and people shouting and running about. The paramedics, afraid for their own safety, were, in these circumstances, unable to conduct a very thorough examination. They did not remove Paul Cooper's shirt or jacket, and they did not, in the end, discover his bullet wound. The paramedics told the police that they found no injury on Cooper.

Cooper and a friend, Donald Parker, were handcuffed and taken to Garrison police station by Officer Dyke. Officer Markert remained at the scene until approximately 3:30 a.m., and then returned to Garrison. Once at the station, Cooper and Parker, along with another friend, Kevin Lovelace, were handcuffed to a detention rail that stood approximately twelve feet away from Desk Officer Morseberger.

Although denied by the officers, Cooper testified that he and his friends repeatedly complained that Cooper had been shot and pleaded with the officers to take him to the hospital. Indeed, Parker's protests were apparently so loud and persistent that he was removed from the rail and placed in a cell in another part of the station. At some point, Cooper's handcuffs were even altered by an unidentified officer so as to permit him to lie down on the floor. Aside from that, however, he remained unattended to until Lovelace vomited on him. When Cooper failed to respond, Officer Morseberger finally decided to examine him more carefully. The wound was discovered and an ambulance was called.

Cooper arrived at the hospital at approximately 5:10 a.m. Dr. Roger Theodore, the trauma surgeon who treated Cooper, testified that Cooper was in profound shock and in need of immediate surgery. He was suffering from internal bleeding, a collapsed lung, a perforated stomach and a lacerated liver and diaphragm. Dr. Theodore further testified that, as a result of his injuries, Cooper would have been in great pain and manifesting a variety of symptoms, including shortness of breath and gasping for air. Cooper recovered after surgery.

We turn to defendants' several contentions and consider them seriatim.

## II.

### Denial of Motions for Directed Verdict and Judgment Notwithstanding the Verdict

■ The denial of defendants' motions for directed verdict and judgment n.o.v. cannot be disturbed unless, without weighing the evidence or assessing witness credibility, we conclude that reasonable people could have returned a verdict only for defendants. See *Gairola v. Virginia Dept. of General Services*, 753 F.2d 1281, 1285 (4 Cir.1985) (directed verdict); *Howard v. McCrory Corp.*, 601 F.2d 133, 137 (4 Cir. 1979) (judgment n.o.v.). We cannot reach that conclusion in this case. Viewed in the light most favorable to Cooper, and giving him "the benefit of all inferences which the evidence fairly supports," *Continental Ore Co. v. Union Carbide & Carbon Co.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962), the evidence is more than adequate to sustain the jury's verdict.

A. The § 1983 deliberate indifference claim

Cooper's theory of recovery under § 1983 is that, after the initial examination by the paramedics, defendants manifested "deliberate indifference" to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Defendants maintain that their duty to Cooper was satisfied when they called the ambulance to the scene, and that they reasonably relied on the medical judgments of the paramedics. However, all three defendants conceded at trial that if Cooper had continued to complain after the initial exam, the officers would have been obligated to seek additional medical attention. Defendants' perception of their obligation accurately reflects the state of the law; government officials who ignore indications that a prisoner's or pretrial detainee's initial medical treatment was inadequate can be liable for deliberate indifference to medical needs. Continued complaints by Cooper, or the manifest symptoms described by Dr. Theodore, would have put defendants on notice that additional care was required. *See, e.g., Miranda v. Munoz*, 770 F.2d 255, 259 (1 Cir.1985) (upholding denial of judgment n.o.v. where "[i]t could be found that defendants ignored a clear warning that the medical treatment they provided for [plaintiff, a pretrial detainee] was inadequate, allowing him to deteriorate beyond recovery"); *Duncan v. Duckworth*, 644 F.2d 653, 654 (7 Cir.1981) ("While the initial failure to properly diagnose [plaintiff prisoner's] injury may be attributable to no more than an error in judgment, ... the failure to promptly schedule surgery, once the need for it was recognized, and in the face of [plaintiff's] repeated complaints of severe pain, ... give[s] rise to at least an inference of [deliberate] indifference").

Defendants' rely on *Sosebee v. Murphy*, 797 F.2d 179 (4 Cir.1986), but we read that case to provide strong support for Cooper's constitutional claim. *Sosebee* was a § 1983 action brought against medical personnel and prison guards on behalf of a prisoner who died from a steak bone piercing his esophagus, after having been misdiagnosed as suffering from gastroenteritis. We affirmed the grant of summary judgment for the medical personnel, and it is this aspect of the opinion on which defendants rely. However, the *Sosebee* court found that the medical personnel had promptly responded to the inmate's requests for medical assistance, and that, at most, there was a possible state law claim for negligent misdiagnosis. *Id.* at 181–82. This holding might be relevant if this were a suit against the paramedics who failed to uncover Cooper's wound, but it is inapposite insofar as the officers are concerned.

As for the officers, *Sosebee*'s holding regarding the prison guards in that case is controlling. We reversed the summary judgment for the guards, stating that "[t]he apparent seriousness of [the inmate's] condition during his last hours of life raises issues of material fact. If the prison guards on duty at that time were aware of [his] physical status but refrained from obtaining medical assistance, an inference of deliberate indifference would arise." 797 F.2d at 182. We found that plaintiff had presented ample evidence that the guards were aware of the inmate's increasingly severe symptoms, and of the complaints made by both the inmate and nearby prisoners. The guards even threatened the prisoners with solitary confinement if they did not cease their complaints. *Id.*

The parallels to this case are striking. According to Cooper, he and his friends repeatedly pled with the officers to obtain medical attention for Cooper's gunshot wound, but the officers either ignored them or told them to "shut up" because Cooper had already been examined. Cooper's friend Parker apparently complained so vociferously that he was moved to another part of the station. Cooper himself attracted enough attention at one point to convince an officer to change his handcuffs so that he could lie down on the floor. Moreover, as was the case for the inmate in *Sosebee*, Cooper's "symptoms would have made it obvious that he required immediate medical attention during this time period." 797 F.2d at 182. These indications that

defendants had notice of Cooper's need for further medical care are underscored by the officers' knowledge of the chaotic conditions under which the initial exam was undertaken. Claims of "reasonable reliance" on the paramedics' judgments are less than persuasive in these circumstances. In sum, there was, at a minimum, more than sufficient evidence of deliberate indifference to warrant submitting this claim to the jury.[1]

### B. State law false arrest claim

■ Cooper recovered also for deprivation of his liberty without his consent and without legal justification, comprising the common law tort of false arrest or false imprisonment. *Great Atlantic & Pacific Tea Co. v. Paul*, 256 Md. 643, 261 A.2d 731, 738 (1970). Under Maryland law, the existence of "legal justification" is judged according to the principles derived from the law of arrest. *Id.* In the case of police officers, a warrantless arrest is justified only if (a) a misdemeanor or felony was committed in their presence—not even arguably the case here, or (b) if the officers have probable cause to believe that a felony has been, or is about to be, committed. 2 Maryland Law Encyclopedia, "Arrest," § 4 (1960 & Supp.1986).

■ Defendants argue that there was probable cause to arrest Cooper in connection with the shooting of his friend James Hill. However, Officers Dyke and Markert testified that, at the time of the alleged arrest, they did not know what had tran-

spired, let alone what, if any, crime had occurred. The fact that both young men, rather than fleeing the scene when their van was stopped, walked towards Officer Dyke and informed him that each had been shot, casts further doubt on defendants' claim that they reasonably suspected Cooper of shooting his companion. Moreover, although defendants suggest in their brief that there was probable cause for a charge of unlawful weapons possession, the trial testimony indicates that this is a post hoc rationalization that was not relied upon by the officers at the scene. While there was arguably reasonable suspicion to stop and question Cooper and his companions, probable cause to believe them guilty of a particular crime seems to be lacking.

■ Defendants further argue that an absence of probable cause would not be fatal since Cooper was not officially placed under arrest. However, this common law tort does not depend on a formal arrest, but rather on defendants' manifest intent to take someone into custody and subject him to their control. *See Bouldin v. State*, 276 Md. 511, 350 A.2d 130 (1976). In this case, Cooper was handcuffed, driven to the police station, and chained to a detention rail for approximately one and a half hours. In addition, Officer Markert was impeached at trial with his deposition statement that Cooper *was* arrested that night. This is sufficient to support a claim of false arrest, or at least to make it a question for the jury.

1. Defendant Morseberger, the desk officer at the station, argues that the evidence against him was particularly weak. However, he testified at trial that he was the officer closest to Cooper, on a continuing basis, at the station, and that it was at least partially his responsibility to monitor the detainees. Plaintiff testified that he and the other youths repeatedly complained to the nearby officers—including the desk officer—but that they were ignored or told to shut up. There is ample evidence to support the verdict against Morseberger.

At oral argument, Officer Markert's attorney alleged that Markert did not travel back to the station with Cooper, and that he had no involvement with Cooper after the time of the paramedic exam. Thus, counsel argued, Markert could not be liable for indifference to Cooper's

medical needs, since Cooper had limited this claim to the post-exam period. It is true that Markert did not go immediately to Garrison station; he remained in the Skateland area until approximately 3:30 a.m. However, at that point, he did go back to the station and he did see Paul Cooper there, chained to the detention rail. Markert conceded that Cooper would have been, at that time, at least partially his responsibility. Moreover, when asked if Cooper appeared to be in any distress, Markert stated: "The only distress I remember Mr. Cooper being in was one of probably being there, to begin with, and secondly, saying his stomach hurt and just to make a normal grimace that his stomach hurt." Here, too, there is ample evidence to support the jury's finding of liability.

## III.

### The Jury Instructions

■ Defendants contend that the negligence of the ambulance crew was an intervening cause of Cooper's injury sufficient to absolve the officers of any liability, and that the district court erred in failing to give defendants' proffered instruction on intervening causes. However, Cooper's claim was based on defendants' deliberate indifference to his continued complaints and obvious suffering *after* the time of the initial paramedic exam.[2] The paramedics' negligence thus could not have constituted an "intervening" cause, and defendants were not entitled to a special instruction. The district judge reached this same conclusion during the trial, a conclusion with which defendants' counsel indicated agreement. Moreover, the proximate cause instructions that were given were adequate to account for defendants' legal theory.[3]

Defendants argue that the good faith instruction used by the district court was improperly taken from *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[4] *Harlow* held that government officials are immune from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." 457 U.S. at 818, 102 S.Ct. at 2738. *See also Whisenant v. Yuam,* 739 F.2d 160, 164–65 (4 Cir.1984) (*Harlow* standard not met in case involving pretrial detainee's deliberate indifference claim, since Supreme Court precedents have clearly established the duty owed by public officials in this context). Defendants fail to explain why the *Harlow* standard is inapplicable here, or why they believe it has been undercut by *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), in which the Supreme Court explicitly declined to consider the qualified immunity issue. *Id.,* 106 S.Ct. at 1088. We perceive no error in the court's reliance on *Harlow.*

Defendants also criticize the good faith instruction as confusing. The court's reference to "objective reasonableness" was taken directly from the language in *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Although its inclusion in the instruction here may not have contributed to the jury's clarity of understanding, we consider the instruction as a whole to be relatively clear and comprehensible: the jury was properly told to determine if defendants' conduct violated clearly established legal standards, as judged objectively, by a reasonable person.

---

**2.** Indeed, defendants themselves rely on this time factor in arguing that there was insufficient evidence to sustain the verdict against Officer Markert. *See supra* note 1.

**3.** The jury was instructed:

An injury or damage is proximately caused by an act or failure to act, whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage. And that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission. If you find the defendants committed no wrongful act or if you find that any wrongful act which the defendants did commit, did not proximately cause the injuries complained of by the plaintiff, then you must find in favor of the defendants on the issue of monetary damages.... [I]f the monetary damages claimed by the plaintiff are not related to any action on the part of the defendants, or any of them, then even though the plaintiff's suffered a loss, that loss is not chargeable to these de-

fendants. Thus, if you find that the plaintiff did suffer monetary damage or injury, if you find that that injury was a result of factors other than the treatment he received while in control of the defendants, then you may not award damages based on those injuries or loss.

**4.** The instruction was as follows:

Now you are instructed that the defendants, as they are, Baltimore County Police Officers, are public officials and as such they are immune from liability under Section 1983, if their actions were undertaken in good faith. Thus, the officials are not liable for damages, insofar as their conduct did not violate clearly established statutory or Constitutional rights, of which a reasonable person would have known. Whether an official may prevail in this defense depends upon the objective reasonableness of his conduct, as measured by reference to clearly established law. The burden is on the defendants to establish this good faith defense to the claim under Section 1983, by a preponderance of the evidence.

■ Defendants next criticize the district court's instructions regarding punitive damages. Such damages are available in § 1983 actions for conduct that involves "reckless or callous indifference to the federally protected rights of others," as well as for conduct motivated by evil intent. *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). *See Generally* Cook & Sobieski, 2 Civil Rights Actions, "Punitive Damages," ¶ 4.08 (1986). Defendants' contention that there was insufficient evidence to establish willfulness or malice is thus irrelevant. The callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability on the § 1983 claim; the propriety of a guilty verdict on the latter thus supports the punitive damage award as well.[5] The district court properly told the jury that it was permitted, but not required, to assess punitive damages. There was ample, though disputed, evidence of disregard for Cooper's repeated complaints and obvious symptoms; submission of the punitive damages issue to the jury was thus appropriate.

■ The district court's instruction on the constitutional standard for the § 1983 claim explicitly referred only to the Due Process Clause of the Fourteenth Amendment. Defendants contend that this was error, i.e., that it is the Eighth Amendment's protection against cruel and unusual punishment, rather than the Fourteenth Amendment's protection against deprivations of liberty without due process, that was applicable in this case. However, while the Eighth Amendment is properly invoked on behalf of those convicted of crimes, it is the Due Process Clause of the Fourteenth Amendment that applies to pretrial detainees like Cooper. *Ingraham v. Wright*, 430 U.S. 651, 671–72 & n. 40, 97 S.Ct. 1401, 1412–13 & n. 40, 51 L.Ed.2d 711 (1977); *Loe v. Armistead*, 582 F.2d 1291, 1293–94 (4 Cir.1978), *cert. denied sub nom. Moffitt v. Loe*, 446 U.S. 928 (1980). In any event, the specific amendment cited to the

jury is not particularly significant as long as the standard for liability was accurately laid out. Defendants do not contest the court's recitation of the standard, and there is no basis for reversal on this ground.

At trial, both parties apparently agreed on the use of the "deliberate indifference" standard established in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). We note, however, that this standard imposes a heavier burden on the plaintiff than was necessary. Because *Estelle* involved a convicted prisoner, the Court analyzed the case in terms of the Eighth Amendment, and concluded that "deliberate indifference to [a prisoner's] serious medical needs" constitutes cruel and unusual punishment. *Id.* at 106, 97 S.Ct. at 292. Plaintiff Cooper, however, was not convicted of any crime. The significance of this distinction was explained in *Ingraham v. Wright*, 430 U.S. at 671–72, n. 40, 97 S.Ct. at 1412–13 n. 40:

> Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment. (citations omitted)

*See also Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979) ("Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment").

■ Since Cooper was, at most, a pretrial detainee, he needed only to prove that he was punished, in contravention of the

---

5. The Court in *Smith* specifically held that there is no requirement that the standard for punitive damages be higher than the standard for determining liability. 461 U.S. at 51–55, 103 S.Ct. at 1637–38.

Fourteenth Amendment, rather than that he was punished in a cruel and unusual manner, in violation of the Eighth Amendment. In fact, even the requirement of proof of punishment is arguably too high a burden of proof under the circumstances here. The Court in *Wolfish* noted that the Government may lawfully detain an individual prior to trial and "subject him to the conditions of the detention facility so long as those *conditions and restrictions do not amount to punishment....*" 441 U.S. at 536–37, 99 S.Ct. at 1873. These curtailments of liberty are permitted only because there has already been a "judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Id.* at 536, 99 S.Ct. at 1872 (quoting *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975)). There has frequently been a bail hearing as well. *Wolfish,* 441 U.S. at 536, 99 S.Ct. 1872. In Cooper's case, however, there had been no hearing to assess probable cause or set bail—indeed, no judicial determination that there was *any* basis for Cooper's detention. As defendants themselves repeatedly stressed, he was never officially placed under arrest. In these circumstances, where no process was invoked, even deprivations of liberty that do not rise to the level of "punishment" arguably suffice to establish a Fourteenth Amendment violation.

Defendants mistakenly rely on *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), which found the Due Process Clause to afford no greater protection than the Eighth Amendment. That case dealt solely with the rights of convicted prisoners, and the Court expressly so limited its holding. The Court was careful to point out that the case did not involve pretrial detainees, and noted that its deci-

sion implied nothing about the scope of the Due Process Clause "outside the prison security context." *Id.* at 1088.[6]

## IV.

### Irregularities in the Jury's Deliberations

Shortly after the jury retired to begin its deliberations, it sent out a note requesting a verdict form. In response, the jury was apparently given a copy of part of the second amended complaint, which had not been introduced into evidence. This was done without the judge's knowledge, and without the knowledge or consent of defense counsel. Defendants contend that this constitutes reversible error.

■ Absent "exceptional circumstances" which impinge on the integrity of the proceedings, a new trial should not be granted where the movant failed to raise a timely objection to the alleged impropriety. *Dennis v. General Electric Corp.,* 762 F.2d 365, 366–67 (4 Cir.1985). *See also* 6A Moore's Federal Practice (1986) ¶ 59.08[4]. Unfortunately, there is no record of most of what transpired here. However, defense counsel conceded at oral argument that he was told of the incident a few minutes after it happened, and well before a verdict was rendered. There was thus ample time for a curative instruction to be given. Under these circumstances, we will not permit counsel to "sit silently by and take chances on a favorable verdict and then complain when it turned out to be unfavorable." *Upton v. Harrison,* 68 F.2d 232, 234 (4 Cir.1934). No "exceptional circumstances" are present which would warrant deviation from this general rule.

■ Even if the issue remained viable on appeal, a new trial could be ordered only if defendants were prejudiced by the jury's receipt of the complaint. 6A Moore's Fed.

---

**6.** Our opinion in *Whisenant v. Yuam,* 739 F.2d 160 (4 Cir.1984) is not to the contrary. We noted there that *"Loe v. Armistead,* 582 F.2d 1291 (4 Cir.1978) holds that the 'deliberate indifference' standard is applicable to pretrial detainees under the fourteenth amendment." 739 F.2d at 163 n. 4. In *Whisenant,* we concluded that *the pretrial detainee-plaintiff had adequate-*ly made out a deliberate indifference claim; we were thus not required, or asked, to decide if a

lesser standard would be applicable. Moreover, in *Loe,* we explicitly stated that "we need not decide the exact scope of the protection that due process provides [to a pretrial detainee] because we agree ... that due process is *at least* as coextensive as the guarantees of the eighth amendment," and that Loe's allegations satisfy the eighth amendment. 582 F.2d at 1294 (emphasis added).

Prac. ¶ 59.08[4]. It appears that only counts one and two were sent to the jury, in which case the possible prejudice is minimal since the jury would thus not have seen the *ad damnum* clause requesting a total of $350,000 in damages. Moreover, defense counsel acknowledged at oral argument that the district judge had, without objection, read a paraphrased version of the complaint in his instructions to the jury. Any incremental prejudice that occurred when the jury viewed the original complaint was necessarily slight.

Defendants also claim that the verdict was the product of an improper barter or compromise. They note that, at one point during its deliberations, the jury reported that it could not reach agreement. Subsequently, a verdict form was returned which showed several erasure marks and a damage award that was equally divided among the three defendants.

Defendants' characterization of the deliberation process derives from speculation that lacks solid evidentiary support. It is well-settled that "a verdict cannot be upset by speculation"; the impropriety must be evidenced by "legally *competent* proof." 6A Moore's Fed.Prac. ¶ 59,08[4] (emphasis in original). We think it unlikely that the verdict here resulted from improper deliberative techniques. Compared to the amount sought, the verdict does not represent a reduction of damages to appease those opposing *any* finding of liability. Nor is there any basis for believing that the award represents an improper averaging of individual jurors' preferred damage figures without unanimous agreement on the final number actually chosen. *See id.* Defendants' motion for a new trial was thus properly denied.

## V.

### The Attorneys Fee Award

■ In determining an appropriate award of attorneys' fees, the district court is required to explain the basis for its assessment, including its application of the factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5 Cir.1974). *Mammano v. Pittston Co.*, 792

F.2d 1242, 1245 (4 Cir.1986). If this requirement is met, the scope of appellate review is very narrow. *Daly v. Hill*, 790 F.2d 1071, 1078–79, 1085 (4 Cir.1986). The district court's lengthy opinion on this issue (Mem. & Order, Civ. No. R–83–4074, June 24, 1986) demonstrates a carefully reasoned analysis of both the factual circumstances and relevant legal precedents. Its rejection of plaintiff's request for a ten percent increase based on certain *Johnson* factors, *id.* at 11–13, and its reduction of the additional fee request as "excessive," *id.* at 15–16, indicate both an objectivity towards the parties and an attention to detail. We perceive no abuse of discretion.

■ Defendants allege four sources of error in the fee award, none of which provide a basis for reversal:

(1) Excessive and duplicative time included in calculation of fee

The Supreme Court has held that "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary...." *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). In this case, plaintiff's attorneys submitted a claim for only 386.8 hours, even though they had actually expended 529.7 hours. The district court found this to be a "conscientious[ ]" decision, and concluded, "after a thorough analysis," that the "detailed billing report" demonstrated the reasonableness of the hours claimed. (Mem. & Order, Slip. op. at 9) This conclusion itself seems quite reasonable.

(2) Refusal to reduce fee to reflect plaintiff's "partial" success

Full compensation for hours expended does not require plaintiff to prevail on every claim. For example, where all claims are closely related because based on common facts or related legal theories, a court is not obligated to determine which hours were spent on which claims. A contrary rule would be unworkable, and would discourage innovative litigation. *See City of Riverside v. Rivera*, — U.S. ——, 106

S.Ct. 2686, 2690–93, 91 L.Ed.2d 466 (1986). Moreover, the absence of more than nominal damages on the false arrest count does not diminish plaintiff's right to full compensation. *Hensley,* 461 U.S. at 434–35, 103 S.Ct. at 1939–40; *Rivera,* 106 S.Ct. at 2694–95 (explaining that fee awards need not be proportionate to amount of damages recovered, and affirming award that was seven times greater than total amount of damages). The district court in this case properly concluded that the overlapping claims and "excellent results obtained" warranted full compensation. (Mem. & Order, Slip. op. at 7)

(3) Ten percent increase in fee award to account for inflation and market rates

Attorneys are entitled to fee awards that reflect the economic impact of delay and inflation; "[t]he particular method of accounting for delay in payment is within the discretion of the district court." *Daly,* 790 F.2d at 1081. Although defendants claim that there was no basis for the ten percent increase, the district court found it necessary "to reflect current market rates." (Mem. & Order, Slip. op. at 10) Although it would have been preferable for the court to have been more explicit about the source for the ten percent figure, no abuse of discretion is evident.

(4) Failure to limit award to amount recoverable under the contingency fee agreement between plaintiff and his attorneys

The Supreme Court has made it clear that, because contingency fee arrangements are often inadequate to encourage attorneys to undertake civil rights cases, fee awards under § 1988 need not be based on such arrangements. *Rivera,* 106 S.Ct. at 2695–97. There was no reason for the district court to limit its award to the amount recoverable under the fee agreement between plaintiff and his counsel.

## V.

To summarize: we find no merit in defendants' arguments on appeal, and therefore affirm the judgment entered in favor of plaintiff Cooper. Cooper's attorneys are entitled to the entirety of the fee award ordered by the district court, as well as their reasonable fees incurred in preparation of this appeal. Accordingly, we remand the case to the district court for the sole purpose of determining the additional fees which are now due to plaintiff's counsel.

*AFFIRMED AND REMANDED.*