**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-7102

SHELLY KAYE STEVENS, Personal Representative of The Estate of James Allen Leslie Stevens,

Plaintiff - Appellant,

v.

DAWN M. HOLLER, LPN; STEPHANIE D. SHROYER, RN; DONALD FREDERICK MANGER, MD; LESLIE A. LOGSDON, RN; JAMES A. PIAZZA, PA; LISA R. SHUTTS, LPN; JODI L. BRASHEAR, LPN; WELLPATH, LLC, d/b/a Correct Care Solutions,

Defendants - Appellees,

and

BOARD OF COUNTY COMMISSIONERS FOR ALLEGANY COUNTY, MARYLAND; CRAIG ROBERTSON, In His Official Capacity as Sheriff of Allegany County and Individual Capacity; R. LEE CUTTER, In his Official Capacity as Assistant Administrator of The Allegany County Detention Center and Individual Capacity,

Defendants.

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Mark Coulson, Magistrate Judge. (1:19-cv-03368-JMC)

Argued: March 7, 2023                    Decided: May 30, 2023

Before THACKER and HEYTENS, Circuit Judges, and Joseph DAWSON III, United States District Judge for the District of South Carolina, sitting by designation.

---

Reversed and remanded by published opinion. Judge Thacker wrote in the opinion, in which Judge Heytens and Judge Dawson joined.

---

**ARGUED:** Lauren M. McLarney, ROSENBERG MARTIN GREENBERG, LLP, Baltimore, Maryland, for Appellant. Daniel Anthony Griffith, WHITEFORD TAYLOR PRESTON LLC, Wilmington, Delaware, for Appellees. **ON BRIEF:** Charles N. Curlett, Jr., ROSENBERG MARTIN GREENBERG, LLP, Baltimore, Maryland, for Appellant. Kelly M. Goebel, WHITEFORD, TAYLOR & PRESTON, L.L.P., Baltimore, Maryland, for Appellees.

---

THACKER, Circuit Judge:

Shelly Kaye Stevens ("Appellant"), as personal representative of the estate of James Allen Leslie Stevens ("Decedent"), filed a second amended complaint alleging Decedent suffered deliberate indifference to his serious medical needs while in custody at the Alleghany County, Maryland Detention Center ("ACDC"), which led to his death.

Appellant asserts claims against licensed practical nurses, Dawn Michelle Holler ("Holler"), Lisa Shutts ("Shutts"), and Jodi Lynn Brashear ("Brashear"); registered nurses, Stephanie Diane Shroyer ("Shroyer") and Leslie Anne Logsdon ("Logsdon"); physician Donald Frederick Manger ("Dr. Manger"); and physician's assistant James Anthony Piazza ("Piazza") (the "Individual Medical Defendants") and against the company contracted to provide medical care services to inmates at ACDC, Wellpath, LLC, formerly Correct Care Solutions ("CCS") (collectively "Appellees").

As to Appellant's claim of deliberate indifference to Decedent's serious medical needs, the district court held that while "the [Second] Amended Complaint may adequately state allegations of medical negligence against [the Individual Medical Defendants] . . . it fails to support a cause of action against them for a constitutional violation." J.A. 489.[1] Therefore, the district court dismissed Appellant's second amended complaint.

On review, we conclude that the complaint sufficiently alleges a Fourteenth Amendment violation for deliberate indifference to Decedent's serious medical needs. Consequently, we reverse and remand.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties to this appeal.

3

I.

On November 25, 2016, Decedent voluntarily surrendered to ACDC pursuant to a bench warrant for his arrest. When Decedent turned himself in, he was 44 years old, weighed approximately 375 pounds, and had a history of congestive heart failure, high blood pressure, diabetes mellitus, asthma, neuropathy, and a leg wound. Decedent was prescribed 20 different medications to manage these conditions. In addition, Decedent smoked five packs of cigarettes and drank alcohol daily. He had a history of recreational drug use, including regular use of oxycodone, Klonopin, Ativan, Xanax, and heroin nasal spray, and had last used drugs the day prior to his surrender.

Decedent arrived at ACDC and was taken to a holding cell at 12:55am. He had brought a portable oxygen tank and insulin needles with him, but those were confiscated upon his arrival. Decedent was officially received into custody at 1:41am. What happened in the four days between Decedent's intake at ACDC and his discharge is at the heart of this case. To determine whether Appellees were deliberately indifferent to Decedent's serious medical needs, we find it important to recount the facts, as alleged in the second amended complaint, in some detail.

- Upon presentation at ACDC, Holler performed a medical screening on Decedent. Decedent reported that he had no history of alcohol withdrawal, and his only symptom of drug withdrawal was "loose stools." *Id.* at 277 ¶ 34. Decedent's pulse and respiration rates were normal, and he was alert and oriented, thinking logically, and acting and speaking normally. While Decedent indicated his pain level as a six out of ten, Holler did not identify where Decedent felt pain or attempt to diagnose the reason for the pain. Additionally, Decedent's blood pressure was 185 over 100. Overall, the "primary medical screening records confirm that [Decedent] was in stable condition at the start of his detention." J.A. 277 ¶ 29.

4

- Holler issued three medical orders: (1) Alcohol and Benzodiazepine withdrawal treatment; (2) opiate withdrawal protocol;[2] and (3) a 2,800-calorie diabetic diet. Shroyer approved Holler's preliminary screening.

- Dr. Manger -- who was not present at ACDC -- approved Holler's treatment plan and ordered Decedent to continue taking the medications he brought with him.

- Dr. Manger also prescribed five new medications pursuant to the two withdrawal protocols ordered by Holler, including Vitamin B and Librium. Appellant asserts that "Librium could exasperate, rather than treat, any stress to [Decedent's] heart brought on by withdrawal or some other undiagnosed, dormant or emerging condition" based on Decedent's heart condition. *Id.* at ¶ 68. Dr. Manger prescribed three other medications to treat vomiting, diarrhea and muscle pain, as needed.

- 8:00am on November 25, Decedent received his first dose of Librium.

- 1:45pm on November 25, Shroyer spoke with Decedent's daughter by phone, and noted in Decedent's medical record, "[Decedent's daughter] will get [the] message to [Appellant] to come back to pick up items that are not approved for use. (02 tank, Syringes, Inhaler Chamber, Aerosol Del. System)." J.A. 283 ¶ 64 (second alteration in original).

- 4:00pm on November 25, Decedent received a second dose of Librium.

- Approximately 15 minutes after Decedent received his second dose of Librium, his blood pressure rose to 190 over 112, and he began vomiting.

- 4:35pm on November 25, Decedent's blood sugar spiked to 205. No doctor was consulted regarding Decedent's deterioration.

- November 25 was a court holiday and bond hearings were not being scheduled. Nevertheless, "in response to [Decedent's] precarious health status," "Shroyer or Logsdon took steps to request that a Circuit Court Judge hold a bond hearing for [Decedent]." *Id.* at 285 ¶ 76. But these efforts proved unsuccessful.

---

[2] Holler's "Opiate Withdrawal Provider Orders" note a verbal order from Dr. Manger.

- Decedent's health continued to decline and by 8:55pm on November 25, he "was still vomiting to the same degree he was four hours prior, and he had increased sweating and anxiety." J.A. 285 ¶ 80. Logsdon took Decedent's vitals and noted his respiration rate had increased from 20 to 24, which is indicative of tachypnea.[3]

- Despite "both withdrawal protocols" indicating the need to contact a "health care provider" if a patient's "respirations exceed 20," Logsdon did not contact a physician, perform an x-ray, or seek to have Decedent transported to another facility for an electrocardiogram, which ACDC was not equipped to perform. *Id.* at 285 ¶ 78.

- Instead, Logsdon gave Decedent 20 ounces of Gatorade and checked his oxygen saturation. This was the first time since Decedent's oxygen machine had been taken away that his oxygen levels had been monitored.

- By the end of the day on November 25, Decedent was exhibiting symptoms of myocardial infractions or obstructions of the blood supply to an organ or region of tissue that cause local death of tissue. At this point, Decedent "was clearly in medical distress." *Id.* at 285 ¶ 81.

- By the middle of the night on November 25, Decedent "was in critical condition." *Id.* at 287 ¶ 89. He was "moved to a cot in the booking department. He was sweating, disoriented, and ill." *Id.*

- 1:00am on November 26, Logsdon observed beads of sweat on Decedent's face and forehead. Decedent's pulse rate had dropped, his respiration rate was "alarmingly high," and his scores pursuant to the withdrawal protocols were "markedly high." *Id.* at 287 ¶ 91.

- At that point, Decedent was exhibiting signs of a heart attack and/or sepsis.[4] Based on Decedent's medical history, conditions, and present symptoms,

---

[3] The Cleveland Clinic defines tachypnea as "quick, shallow breathing" which "makes you feel like you're not getting enough air." *Tachypnea*, Cleveland Clinic, (Sept. 9, 2022) https://my.clevelandclinic.org/health/symptoms/24124-tachypnea (saved as ECF Opinion Attachment).

[4] Sepsis is "a life-threatening medical emergency" that "happens when an infection . . . triggers a chain reaction throughout [the] body." Centers for Disease Control and Prevention, *What is Sepsis?*, Sepsis (Aug. 9, 2022), https://www.cdc.gov/sepsis/what-is-sepsis.html (saved as ECF Opinion Attachment).

"sepsis could not [have been] ruled out." *Id.* at 288 ¶ 94. And "[s]epsis is a medical emergency that *requires* hospitalization; even with early treatment, it is fatal 20% of the time." *Id.* at ¶ 95 (emphasis supplied).

- "[T]he Federal Bureau of Prisons advises that when an inmate with hypertension or congestive heart failure has a CIWA-Ar[5] score above 15 . . . hospitalization is strongly suggested." *Id.* at 289 ¶ 97. Given Decedent's CIWA-Ar score of 19, treatment protocols called for hospitalization. But rather than take Decedent to a hospital, Logsdon called Piazza who ordered an increase in Decedent's Lisinopril -- which he was prescribed to prevent a heart attack. Additionally, Logsdon again provided Gatorade, as well as a cool cloth and extra blankets to prop Decedent's head up.

- By 6:00am on November 26, Decedent was still very ill. Logsdon's records indicate Decedent's withdrawal "scores were unchanged, and his level of vomiting, sweating, agitation, disturbances, anxiety and aches had not gone down since the early morning." *Id.* at 294–95 ¶ 116.

- At 8:00am on November 26, Shutts administered more Librium to Decedent. Within the hour, Decedent's pulse rate increased, his respirations remained high, and "he continued to exhibit the aforementioned symptoms, like vomiting and sweating." *Id.* at 295 ¶ 119.

- By the afternoon of November 26, Shutts determined that Decedent had stabilized as his symptoms had substantially decreased in severity.

- At 5:00pm on November 26, Shutts assessed Decedent again and observed that he still had tachypnea and his pulse rate had increased once more. While Decedent's blood pressure was "stable at that moment," it "had fluctuated substantially over the last 40 hours, getting as high as 190 over 112, and as low as 118 over 98." *Id.* at 295 ¶ 122.

- By 8:54pm on November 26, Decedent's respiration rate jumped to 28, the highest of his detention. Nevertheless, Shutts took no action and, at some

---

[5] The Clinical Institute Withdrawal Assessment-Alcohol Scale Revised ("CIWA-Ar") "is an instrument used by medical professionals to assess and diagnose the severity of alcohol withdrawal." The scale measures ten withdrawal symptoms and is "one of the most common methods of treating alcohol withdrawal." American Addiction Centers, *CIWA-AR Assessment for Alcohol Withdrawal*, Alcoholism Treatment, (May 10, 2022), https://americanaddictioncenters.org/alcoholism-treatment/ciwa-ar-alcohol-assessment (saved as ECF Opinion Attachment).

7

point, Shroyer determined that Decedent "would no longer be monitored for opiate withdrawal." *Id.* at 296 ¶ 126.

- On the morning of November 27, Decedent's CIWA-Ar score increased, his systolic blood pressure was up from 133 to 179, his pulse rate went from 99 to 107, and he still had an elevated respiration rate of 26.

- At 8:58pm on November 27, "Shutts found [Decedent] lying in his bottom bunk 'soaked in his own urine.'" *Id.* at 296 ¶ 129. While Decedent's blood pressure and pulse rate had dropped, he "was more anxious and disoriented than he had been a few hours before." *Id.* And his CIWA-Ar score had increased yet again. Shutts did not contact a physician. Instead, Shutts gave Decedent Tums and Gatorade and assisted Decedent into a new set of clothes. By this point, "no health care provider had examined [Decedent's] leg wound or attempted to rule out whether he was septic or having a heart attack." *Id.* at 297 ¶ 132.

- On the night of November 27, Decedent appeared to stabilize. However, by the next morning Decedent refused to eat and had a temperature of 99.8 degrees.

- Around 2:30pm on November 28, Shroyer reported that Decedent "smelled strongly of urine and body odor" and advised that he needed a shower. *Id.* at 297 ¶ 136. During his shower, Decedent was short of breath and required assistance. Brashear was called to assist Decedent with bathing.

- On the afternoon of November 28, Shroyer spoke with Appellant over the phone. Appellant offered to bring Decedent's C-PAP machine and testosterone medication to ACDC. Shroyer declined Appellant's offer. During the call, Appellant asked about Decedent's health status but "Shroyer did not share any information." *Id.* at 298 ¶ 140.

- On the evening of November 28, Decedent was transported from ACDC to the courthouse for his bail hearing. Decedent "was visibly listless and confused throughout the hearing." *Id.* at ¶ 143. Decedent posted bail and returned to ACDC.

- On November 28 at 8:00pm, Decedent was released from ACDC. ACDC regulations indicate that "inmates receiving medical care should be examined before their release." *Id.* at 299 ¶ 146. But Decedent was not examined. Rather, "Brashear asserted, without any supporting facts, that [Decedent]

8

was stable" and advised him to follow up with his primary care physician or the emergency room for care. *Id.* at ¶ 148.

Decedent walked into ACDC on his own power on November 24 but when he was released four days later, he had to be escorted out in a wheelchair. "[O]ne of the nurses charged with [Decedent's] care and at least one correctional officer . . . made comments during [Decedent's] detention indicating that they knew he was fatally ill and wanted him released from the Detention Center as soon as possible, so he would not die inside the facility." *Id.* at 301 ¶ 162. "These comments were overheard by a third party and later recounted to [Appellant]." *Id.*

Upon Decedent's release, Appellant recognized that he was ill and made Decedent an appointment with his primary care provider for the morning of November 30, 2016 -- the earliest available appointment. But it was not soon enough. The morning after his release, Decedent woke up "still unwell and disoriented." *Id.* at 300 ¶ 155. Appellant left Decedent at home while she went to a meeting. Upon her return, she found Decedent dead. A partial autopsy revealed that Decedent died of hypertensive heart failure. Obesity and diabetes mellitus were also contributing causes of death. A toxicology report showed only Librium and no other drugs or alcohol in Decedent's system.

Almost three years to the day after Decedent's death, Appellant filed a complaint in the United States District Court for the District of Maryland. Four days later, Appellant filed an amended complaint which made only a few minor changes. In addition, the amended complaint included claims for municipal liability against Sheriff Craig Robertson, Captain R. Lee Cutter, and the Board of County Commissioners for Allegany

9

County ("County") (collectively, the "County Defendants").  The County moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) arguing that the complaint was "devoid of a single non-conclusory allegation that any medical treatment decision . . . was caused by [the County's] alleged policy." *Id.* at 145.  On April 8, 2020, the district court dismissed the County Defendants.[6]

On May 6, 2020, Appellant filed a second amended complaint asserting seven claims: (1) violation of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 for deliberate indifference to Decedent's serious medical needs as to the Individual Medical Defendants (count one); (2) a § 1983 claim against CCS pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (count two); (3) a claim pursuant to Article 24 of the Maryland Declaration of Rights against the Individual Medical Defendants (count three); (4) a claim pursuant to Article 24 of the Maryland Declaration of Rights against CCS pursuant to *Prince George's County v. Longtin*, 19 A.3d 859 (Md. 2011) (count four); (5) a survival claim of negligence against the Individual Medical Defendants (count five); (6) a wrongful death claim against the Individual Medical Defendants (count six); and (7) a claim of *respondeat superior* against CCS for the alleged tortious conduct of Holler, Shroyer, Logsdon, Shutts, and Brashear (count seven).

Appellees moved to dismiss the second amended complaint.  The district court dismissed counts one through four with prejudice and counts five through seven without

---

[6] Appellant does not challenge the dismissal of her claims against the County Defendants.

prejudice.  With respect to count one, the district court held that, although the parties agreed that Decedent's health conditions were objectively serious, Appellant failed to satisfy the subjective component of the deliberate indifference standard.  The district court concluded that the second amended complaint failed to demonstrate that the Individual Medical Defendants knew that Decedent needed further care and, instead, that the allegations amounted simply to a disagreement about his treatment.   Without an underlying constitutional deprivation, the district court dismissed count two, Appellant's *Monell* claim, with prejudice.  For the same reasons, Appellant's claims pursuant to Article 24 of the Maryland Declaration of Rights and *Longtin* (counts three and four respectively) were also dismissed with prejudice.  Finally, having dismissed Appellant's federal claims, the district court declined to exercise supplemental jurisdiction over the state law claims alleged in counts five through seven.  Appellant timely appealed.

## II.

"We review a district court's grant of a motion to dismiss de novo." *Owens v. Baltimore City State's Att'y Off.*, 767 F.3d 379, 388 (4th Cir. 2014) (citation omitted).  To survive a motion to dismiss, "a complaint must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting Fed. R. Civ. P. 8(a)(2)). The complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. The court must draw all reasonable inferences in favor of the plaintiff. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Thereafter, the "plausibility standard requires only that the complaint's factual allegations 'be enough to raise a right to relief above the speculative level.'" *Houck v. Substitute Trustee Serv., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555).

III.

A.

We begin our analysis by addressing count one of Appellant's complaint, alleging deliberate indifference to Appellant's serious medical needs in violation of 42 U.S.C. § 1983, as to the Individual Medical Defendants.

1.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). However, a pretrial detainee's claim of constitutionally inadequate medical care is governed by the Fourteenth Amendment, rather than the Eighth Amendment. *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). Although "the precise scope of this Fourteenth Amendment right remains unclear[,] . . . a pretrial detainee makes out a violation at least where [the detainee] shows deliberate indifference to serious medical needs under cases interpreting the Eighth Amendment." *Id.* (internal citations and quotation marks omitted);

12

*see also Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244–46 (1983) (concluding that due process rights of pretrial detainee are at least as great as Eighth Amendment protections available to convicted prisoners).

To state such a claim, the detainee "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. Deliberate indifference is a high standard and "the mere negligent or inadvertent failure to provide adequate care is not enough." *DeShaney v. Winnebago Cnty. Dep't. of Soc. Serv.*, 489 U.S. 189, 198 n.5 (1989).

The test for deliberate indifference is two-pronged and includes both objective and subjective elements. *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021). Appellant must demonstrate that (1) Decedent was exposed to a substantial risk of serious harm (the objective prong); and (2) the prison official knew of and disregarded that substantial risk to the inmate's health or safety (the subjective prong). *Farmer v. Brennan*, 511 U.S. 825, 837–38 (1994). Here, Appellees do not dispute prong one. *See* J.A. 481 (district court noting the parties did "not dispute that the Decedent's underlying health conditions satisfy the first prong of *Farmer*, as they were objectively serious"). Therefore, this case turns on the subjective prong; that is, whether the Individual Medical Defendants acted with a "sufficiently culpable state of mind," specifically, deliberate indifference to Decedent's health. *Mays*, 922 F.3d at 299 (quoting *Farmer*, 511 U.S. at 834).

2.

The district court concluded that Appellant's claims "do not satisfy the subjective deliberate indifference standard for a variety of reasons." J.A. 482. The district court held

13

that Appellant failed to plead actual knowledge because the complaint "acknowledge[s] that none of the Individual [Medical] Defendants 'thought it necessary' to take the Decedent to the hospital." *Id.* at 483 (quoting J.A. at 269). And, in any event, the district court concluded that instead of stating an actionable claim for deliberate indifference to serious medical needs, Appellant had merely asserted that Appellees failed to provide Decedent with his desired level of care and had, at most, outlined a claim of medical negligence.

On appeal, Appellant challenges the district court's holdings, primarily arguing that the district court failed to draw all reasonable inferences in her favor, as we have plainly required time and again. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009); *Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 117 (4th Cir. 2020).

a.

At this stage, Appellant must adequately allege "that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious medical care." *Young v. City of Mount Rainer*, 238 F.3d 567, 57–76 (4th Cir. 2001) (citing *White ex rel. White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997)). However, the subjective component may be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

As an initial matter, we disagree with the district court's conclusion that Appellant failed to plead actual knowledge when she alleged that none of the Individual Medical Defendants "thought it necessary to take [Decedent] to the hospital." J.A. 483. In so

14

holding, the district court failed to consider the context of the allegation, disregarded the obvious sarcasm in the full allegation. Appellant actually alleged that none of the Individual Medical Defendants "thought it necessary to take [Decedent] to the hospital despite an *obvious* on-going medical emergency." *Id.* at 269 (emphasis supplied).

Appellant's 44 page second amended complaint sets out in meticulous detail Decedent's persistent, documented decline in health and care, and the Individual Medical Defendants' knowledge that harm would result. For example, Appellant alleged that, despite November 25 being a court holiday, "in response to [Decedent's] precarious health status," "Shroyer or Logsdon took steps to request that a Circuit Court Judge hold a bond hearing for [Decedent]." J.A. 285 ¶ 76. This fact, taken together with the assertion that "[O]ne of the nurses charged with [Decedent's] care and at least one correctional officer . . . made comments during [Decedent's] detention indicating that they knew he was fatally ill and wanted him released from the Detention Center as soon as possible, so he would not die inside the facility," *id.* at 301 ¶ 162, clearly implies that the Individual Medical Defendants knew that harm would result and did next to nothing. Moreover, Appellant has alleged that Brashear "asserted, without any supporting facts, that [Decedent] was stable" at the time of his release, despite never conducting any pre-release examination as required by ACDC regulations. *Id.* at 299 ¶ 148. This allegation is sufficient to infer that Brashear knew Decedent was likely to suffer harm but nevertheless disregarded that fact.

Further, Appellant alleged at least three protocol violations which demonstrate the Individual Medical Defendants "knew of and disregarded a substantial risk of serious

15

injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." *Young*, 238 F.3d at 575–76. These allegations include:

- On intake, Decedent's systolic blood pressure was 185. Holler "consulted protocols that instructed her to contact a health care provider when a patient's systolic blood pressure exceeds 180;" however, Holler "did not consult a physician." J.A. 278 (Second Am. Compl. ¶¶ 38–39).

- Decedent's respiration rate increased to 24 and "both withdrawal protocols say that a health care provider should be contacted when respirations exceed 20." *Id.* at 285 ¶ 78. However, "Logsdon did not contact a physician regarding [Decedent's] alarming respiration rate." *Id.* at 285 ¶¶ 78–79.

- Decedent's CIWA-Ar score reached 19. *Id.* at 287 ¶ 91. "[T]he protocol for a patient with a CIWA-Ar score of 19 still calls for hospitalization. Indeed, the Federal Bureau of Prisons advises that when an inmate with hypertension or congestive heart failure has a CIWA-Ar score above 15 or exhibits severe symptoms of withdrawal, hospitalization is strongly suggested." *Id.* at 289 ¶ 97.

Appellant sufficiently alleged that the Individual Medical Defendants knew of and disregarded a substantial risk of serious injury to Decedent. We therefore conclude that the subjective prong of the deliberate indifference test is satisfied.

b.

We also reject the district court's conclusion that Appellant's deliberate indifference claim amounts to no more than mere disagreement over the proper course of Decedent's treatment.

It is true that "mere disagreements between an inmate and [prison medical staff] over the inmate's proper medical care" are insufficient to establish deliberate indifference

16

"absent exceptional circumstances," *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016), and a claim for deliberate indifference to medical needs requires more than a showing of mere negligence. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). In fact, this court has held that treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124 (4th Cir. 2020).

Significantly, we have rejected the notion that simply because medical staff have provided an inmate with "*some* treatment" that "they have necessarily provided [the inmate] with *constitutionally adequate* treatment." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (emphasis in original). Rather, "the treatment a prison facility [provides] must . . . be adequate to address the prisoner's serious medical need." *Id.* And "government officials who ignore indications that a prisoner's or pretrial detainee's initial medical treatment was inadequate can be liable for deliberate indifference to medical needs." *Cooper v. Dyke*, 814 F.2d 941 (4th Cir. 1987).

This is precisely what Appellant has alleged here -- that the care Decedent received was constitutionally inadequate. Appellant has sufficiently alleged that the Individual Medical Defendants' treatment and/or attempts at treatment, were not "adequate to address [Decedent's] serious medical needs," that Decedent's deterioration was persistent and obvious, and that the factual allegations allege more than mere disagreements regarding Decedent's medical care. *De'lonta*, 708 F.3d at 526. Indeed, Appellant alleges treatment, or a lack thereof, that was "grossly incompetent, inadequate or excessive as to shock the

17

conscience." *Miltier*, 896 F.2d at 851. As such, Appellant has plausibly alleged a Fourteenth Amendment violation.

B.

We briefly address the district court's dismissal of the remainder of Appellant's claims.

Appellant's *Monell* claim against CCS was dismissed, in part, based on the dismissal of Appellant's underlying constitutional claim. Because we hold that the district court erred in dismissing the constitutional claim, the district court also erred in dismissing count two. Likewise, the district court's dismissal of Appellant's state analog claims pursuant to Article 24 of the Maryland Declaration of Rights[7] and *Longtin*[8] was also in error.

Finally, as to the state law claims contained in counts five through seven, the district court's dismissal was predicated on dismissal of all claims over which the court exercises original jurisdiction. Because dismissal of the federal claims was in error, so too was the district court's dismissal of the state law claims.

---

[7] "Claims under Article 24 of the Maryland Declaration of Rights are assessed under the same standard as a due process claim pursuant to 42 U.S.C. § 1983." J.A. 490 (citing *Burkley v. Correct Care Sols.*, 2020 U.S. Dist. LEXIS 79854, at * 14–15 (D. Md. May 6, 2020)).

[8] Claims for municipal liability pursuant to *Prince George's Cnty. v. Longtin*, 419 Md. 450 (2011) "are essentially Maryland's version of *Monell* claims." J.A. 491 (citing *Rosa v. Bd. Educ.*, No. 8:11-cv-02873-AW, 2012 WL 3715331, at *6 (D. Md. Aug. 27, 2012)).

18

IV.

For the reasons set forth herein, the district court's order is

*REVERSED AND REMANDED.*